[Cite as *L.G. Harris Family Ltd. Partnership I v. 905 S. Main St./Englewood, L.L.C.*, 2014-Ohio-1906.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

L.G. HARRIS FAMILY LIMITED      :
PARTNERSHIP I

     Plaintiff-Appellee      :      C.A. CASE NO.    25871

v.      :      T.C. NO.    09CV9692

905 S. MAIN STREET/ENGLEWOOD,      :      (Civil appeal from
LLC      Common Pleas Court)

     Defendant-Appellant      :

     :

     :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    5th    day of     May    , 2014.

. . . . . . . . . .

RICHARD A. BOUCHER, Atty. Reg. No. 0033614 and JULIA C. KOLBER, Atty. Reg. No. 0078855 and LAUREN E. GRANT, Atty. Reg. No. 0087315, 12 W. Monument Avenue, Suite 200, Dayton, Ohio 45402
     Attorneys for Plaintiff-Appellee

THOMAS L. CZECHOWSKI, Atty. Reg. No. 0022973 and KEVIN P. BRAIG, Atty. Reg. No. 0061816 and GREGORY P. MATHEWS, Atty. Reg. No. 0078276, 1100 Courthouse Plaza, SW, 10 N. Ludlow Street, Dayton, Ohio 45402
     Attorneys for Defendant-Appellant

. . . . . . . . . .

PER CURIAM:

**{¶ 1}** The 905 South Main Street/Englewood L.L.C., ("SMS") appeals from a jury verdict in the Montgomery County Court of Common Pleas, which found that SMS had breached its contract with the L.G. Harris Family Limited Partnership I, owned by Larry Harris and his family ("Harris"), and awarded $302,800 in damages to Harris.

**{¶ 2}** For the following reasons, the judgment will be affirmed in part and reversed in part.

*Facts and Procedural History*

**{¶ 3}** For many years, Harris owned adjacent properties at 909 and 905 South Main Street (Route 48) in Englewood and operated manufacturing facilities on the properties. Both properties are on the west side of Route 48, and the 905 parcel is north of 909. Two buildings had been erected on the 909 property and one on the 905 property. When the properties were used for the manufacturing operation, semi-trailer trucks accessed the loading dock at the rear of one of the buildings on the 909 parcel via the northernmost of three driveways on that property off of Route 48, the one closest to the 905 parcel.

**{¶ 4}** By the early 2000s, the manufacturing operation had ceased, and Harris had sold the 909 parcel to Michael Howell on land contract. Howell operated an auto body shop and towing business at that location. The building on the 905 parcel was in a state of disrepair, with a partially collapsed roof, and the City of Englewood apparently considered it a nuisance. The City initiated discussions with Harris about possibly rezoning the property for development as a restaurant or other commercial venture, which would eliminate the need for Harris to abate the nuisance the property presented. Harris agreed to proceed with

this plan.

{¶ 5}     In approximately 2003, the zoning of the 905 parcel was changed; Harris sold the property to SMS, which planned to build a Tim Horton's restaurant and other retail or restaurant establishments on the property.  (Eventually, the development included Penn Station and BW3 restaurants and a UPS Store, in addition to the Tim Horton's.)

{¶ 6}     Shortly after the sale, SMS sought an easement from Harris to permit additional parking and access for its 905 property.   The easement area consisted of a portion of the 909 parcel adjoining the 905 parcel, near the road; the easement area encompassed approximately half an acre, including the northernmost driveway permitting ingress and egress to the 909 parcel.   Harris consented to the easement, and the parties signed the Common Access Easement and Parking Maintenance Agreement.

{¶ 7}     The easement stated that it was for "ingress, egress, and parking," and it contained several provisions that are pertinent to this appeal.   During the "initial construction," SMS had the right to configure the easement area for parking and access, including "all ordinary and necessary repairs, maintenance, and replacements."    All repairs, maintenance and replacements were required to "be completed in compliance with applicable laws, ordinances, rules and regulations," and SMS bore the costs of these changes.   Thereafter, "all costs to repair, maintain or replace the Easement Area" were to be shared by the parties equally.   Either party intending to make any modification was required to notify the other party in writing, including the estimated cost and attaching two "competitive bids from vendors."   The other party had ten days to object, or it would be deemed to have approved.   If the other party did object, the party proposing the

modification could 1) proceed at its own expense or 2) obtain new bids and resubmit the request.

{¶ 8}    In 2003 or 2004, SMS submitted a plan for its proposed development to the City as part of an application for a conditional use permit.   The proposed plan included an access point through the easement area, where a driveway was already located, and a second driveway further north on the 905 property.   When the City's traffic engineer reviewed the proposed development, however, he concluded that the location of the driveway in the easement area (at the same location as a then-existing driveway) posed a potential traffic hazard; the driveway to another restaurant was located directly across Route 48 from the proposed entrance to the 905 development, which would have required traffic coming from opposite directions on Route 48 to share a center turn lane and created a danger of collisions.  The traffic engineer recommended that the driveway through the easement area be moved and that the two proposed entries be combined into one.   The City approved the development plan subject to the recommendations of the traffic engineer.

{¶ 9}    In 2004, SMS made its initial modifications to the easement area, including paving portions of it for parking and installing a retaining wall at the rear edge of the parking area.    As part of its development, and in keeping with the traffic engineer's recommendation, SMS also created a single driveway on the 905 property and removed the driveway (or "curb cut") in the easement area on the 909 property.

{¶ 10}  For several years after the driveway was moved, until approximately 2008, Howell continued to operate his auto body shop on the 909 property.   However, in November 2009, after Howell's business closed and the land contract terminated, Harris

filed suit against SMS based on its relocation of the driveway, contending that the removal of the original curb cut and driveway precluded semi-trailer access to the 909 property and diminished that property's value. Harris's complaint against SMS alleged two claims for breach of contract (failure to abide by the notice provisions of the easement and impeding access or use of the easement area), trespass, and malicious interference with property rights. Harris sought compensatory damages, punitive damages, attorney fees, and injunctive relief (the restoration of the original driveway). SMS filed an answer asserting, among other things, that it had been impossible to leave the driveway in place due to the requirements imposed by the City when it approved the development; SMS also filed a counterclaim for breach of the common access easement.

{¶ 11} The parties filed a total of four motions for summary judgment while the claims were pending, which were decided by three different judges. Ultimately, the trial court concluded that there were genuine issues of material fact about which reasonable minds could differ as to whether there were feasible alternative access points to the 909 property and as to whether removal of the original access point violated the easement agreement.

{¶ 12} In April 2013, the case was tried to a jury. Harris presented the testimony of three witnesses, including Larry Harris and a property valuation expert. At the end of Harris's case, the trial court granted a directed verdict in favor of SMS on Harris's claim for malicious interference with property rights. The court denied SMS's motions for directed verdict on all of Harris's other claims. SMS presented the testimony of five witnesses, including the developer, a civil and traffic engineer, the City's traffic engineer, the City's

development director, and a valuation expert.

{¶ 13} The jury found in favor of SMS on the trespass claim, but in favor of Harris on the breach of contract claims. In its interrogatory responses, the jury stated that Harris had established breaches of contract for "failure to notify" and "removal or closing of easement area." The jury awarded damages in the amount of $302,800: $160,000 for loss of use of the property, and $142,800 in expectation damages. The trial court did not award attorney fees. No mention was made in the jury instructions, verdict forms, or interrogatories of SMS's counterclaim for breach of contract, but, since SMS's interpretation of the easement agreement was central to its defense, its claim for breach of contract was implicitly rejected.

{¶ 14} SMS filed a notice of appeal. We held that the order from which it appealed was not a final appealable order, because it did not address Harris's request for attorney fees. *L.G. Harris Family Ltd. Partnership I v. 905 S. Main Street/Englewood, LLC*, 2d Dist. Montgomery No. 25735 (June 18, 2013). In July 2013, the parties filed an Agreed Judgment by which SMS agreed to pay $119,358.97 in attorney fees and costs through June 26, 2013. (The easement agreement stated that the prevailing party would recover such fees and costs in any action arising out of the agreement.) On August 20, 2013, SMS filed a second notice of appeal. The matter is now properly before us.

{¶ 15} A summary of the evidence presented at trial will be helpful to our discussion of the assignments of error.

{¶ 16} Larry Harris testified that he owned the properties at 905 and 909 South Main for more than 30 years. During part of that period, both of the properties had been

accessed by semi-trailers at a single access point: the northernmost of three driveways on the 909 property (the driveway that was relocated in this case). With respect to the other driveways, Harris testified that the central entrance to the 909 property had not been used for semi-trailer access because of its potentially hazardous configuration (a drop off of several feet on one side of the drive). Use of the southernmost entrance had been abandoned after a semi-trailer hit the overhang on the south side of the warehouse building while using this route, causing damage to the building.

{¶ 17} Harris testified that, when the City expressed an interest to Harris in developing the 905 property into restaurants and office space, he agreed to rezoning the property, even though its ultimate use was not yet clear. Harris also agreed that, if the property were not sold within a reasonable time, he would raze the building on the 905 property and clean up the property to facilitate its sale.

{¶ 18} The 905 property was sold to SMS in late 2003 or early 2004. Harris testified that, soon thereafter, SMS had approached him with a request for an easement for parking and access, which he granted. According to Harris, he informed SMS that he would still need to access the rear of his property through the driveway that crossed the easement. Harris stated that his willingness to grant the easement had been conditioned on his continued access to the 909 property, and that he would not have given SMS an easement at no cost if he had realized that his access would be impaired by the easement.[1] Harris also testified that he never received notice from the City or SMS that the City required the

---

[1] We note that the easement agreement states that it was entered "for valuable consideration paid, the receipt and sufficiency of which is hereby acknowledged."

removal of the existing northernmost driveway on the 909 property, and that, in any event, he did not believe the easement authorized the closure of the existing driveway.

{¶ 19} On cross-examination, Harris acknowledged that he had no intention, personally, of again operating a business on the 909 property that required semi-trailer access, and that the property could, conceivably, be used by a business that did not require semi-trailer access. At the time of trial, the property was being used for storage by an acquaintance of Harris. Harris also stated that he had never tried to have a semi-trailer access his property via the new driveway to Tim Horton's and that he had received no indication that Tim Horton's would object to his use of that driveway.

{¶ 20} John Hilgeman, an attorney who represented Michael Howell, the land-contract tenant of the 909 property when the 905 property was sold and developed, was not involved in the drafting of the easement. Hilgeman testified that he was familiar with Howell's business, including the presence of semi-trailers, box trucks, flatbed trucks, and tow trucks on the premises, and that he had never seen a truck use a driveway other than the one that was moved in this case. Hilgeman was shown the easement after Howell had consented to it. At trial, Hilgeman testified to his opinion that it was "an ingress/egress easement." In May 2005, Hilgeman sent a letter to SMS's attorney expressing his concerns about removal of the driveway as part of SMS's development. According to Hilgeman, SMS's attorney informed him by letter that the City had required removal of the driveway, although no documentation of this assertion was attached to the letter.

{¶ 21} Harris called Robert Harris (no relationship to the Harris family), a commercial real estate appraiser, as an expert on the value of the 909 property. Robert

Harris testified that there were three ways to appraise a commercial property: the cost method, the sales comparison method, and the income method. Using the sales comparison method, he compared the 909 property to similar vacant properties[2] along Route 48, taking into account similarities and differences in the properties. Robert Harris opined that, in 2012, the fair market value of the 909 property was $725,000 with use of the easement area and semi-trailer access via the then-removed northernmost driveway, and $565,000 without the use of the easement area and without access for semi-trailers, a difference of $160,000. This calculation was based in part on assigning a value to the easement parcel, based on its size, location, and use. Harris testified that "the diminution in value could be more if you have to change the use" of the non-easement portion of the parcel due to restricted access; he did not give an opinion as to how much more. He suggested, as an example, that additional costs could be incurred in converting the property from a warehouse to office space, because there would be a need for remodeling and additional parking spaces, but he did not assign a cost to such changes. Robert Harris also testified to his observation that trucks and cars parked in the parking lots of the developed property (the 905 parcel) could "block that old way of gaining access to the rear of the [909] property."

{¶ 22} SMS presented the following evidence.

{¶ 23} Caroline Duffy, an engineer with expertise in traffic and civil engineering, testified that she was asked to assess three entry points on the 909 property, specifically, whether a semi-trailer could get to the loading docks at the rear of the lot using any or all of

---

[2] Robert Harris was not asked to explain why he used vacant properties as his comparables, but it may be attributable to his attempt to assign a value to the easement area, separate from the rest of the property.

these entrances. According to Duffy, the original configuration of the 909 property permitted access from three driveways. Duffy concluded that the relocation of the northernmost point of access as part of the 905 development did not impede semi-trailer access to the rear of the property through that driveway, and that the rear of the 909 property remained accessible by the other two driveways.

{¶ 24} Duffy based her conclusion on tests she conducted with a semi-trailer at the site, during which the truck was able to maneuver to the back of the property via three different routes. Duffy testified that the central and southern driveways provided access via paved lanes that met minimum accessibility widths and were wider than a standard highway lane. She also determined that the building awning did not present an impediment to access; although a semi-trailer could not pass underneath the awning on the south side of the loading dock building, Duffy testified that the driveways on either side of the building were of sufficient width for a truck to pass alongside the building without hitting the awning or driving off the ledge. Duffy also testified that, even with cars in the drive-thru line of Tim Horton's and/or with trucks at the Tim Horton or BW3 loading docks, a semi-truck could access the rear of the 909 property through the new access point. Duffy believed that the central and southern access points provided better access than the Tim Horton's access point.

{¶ 25} Kevin Miller was the traffic engineer employed by the City of Englewood to consult on the SMS development. Miller testified that the original development plan submitted by SMS called for two access points to Route 48 on the property: one on the 905 parcel and one in the easement area. Miller evaluated this plan using the Ohio Department

of Transportation State Highway Access Management Manual ("the Highway Access Manual"). According to Miller, the Highway Access Manual recommends 250 feet between access points on a road with a speed limit of 35 mph (as Route 48 has at that location). The original development plan did not comply with this recommendation. Miller also testified that the Bolts Restaurant and Bar across Route 48 from the new development had a driveway directly across from the existing driveway in the easement area, which was a concern because the driveways were "offset in the incorrect direction"; the use of the center turn lane for both properties would "overlap" and create the possibility of head-on crashes. Miller recommended that SMS consolidate the two access points in its plan into one, and that it be located at a different point than the original access driveway in the easement. According to Miller, the plan that was ultimately approved by the City incorporated his recommendations.

{¶ 26} On cross-examination, Miller admitted that his recommendation was not equivalent to a rule, law, ordinance, or regulation. Miller also stated that the Bolts driveway had been directly opposite the 909 property's northernmost driveway for many years, and he was unaware of any accidents caused by the opposite entries during that time.

{¶ 27} William Singer, the Englewood Community and Economic Development Director, stated that the development plan for 905 South Main had been reviewed by a civil and traffic engineer (Miller), and that the City had accepted Miller's recommendation regarding the location and number of access drives to the property from Route 48. According to Singer, the City required compliance by the developer with Miller's recommendation. On cross-examination, Singer admitted that the alleged need for access

by semi-trailers to the rear of the 909 property was unknown to the planning commissioners; if it had been known, additional maneuverability issues would have been considered. Based on the information before the planning commissioners, maneuverability had been considered only with respect to deliveries and waste removal from the businesses located on the 905 property. Singer testified, however, that Harris and all other neighbors of the property had been notified of the City's consideration of zoning changes and development of the property.

{¶ 28}    Jeff Samuelson, the architect and developer of the 905 property, testified that the easement did not address "curb cuts" or access points to the easement area, which were located in the City's right of way and not in the easement area. He also testified that the plans to move the curb cut were presented at public meetings about the development, and no one complained or raised any concerns about access to the 909 property during those proceedings. Samuelson did not assert that SMS had given Harris any other notice of the proposed change in the location of the driveway, and SMS did not seek contribution from Harris for the costs associated with this change. Samuelson testified that the easement agreement required SMS to comply with the City's rules and regulations, but did not require SMS to challenge the City's decisions in this regard.

{¶ 29}    Steve Weis, a real estate appraiser, testified for SMS. He visited the 909 property several times and considered numerous factors in evaluating the property before and after the development occurred. Weis concluded that the highest and best use of the property was continued use as "office warehouse commercial property." In making this determination, Weis considered the "physicalities" of the property, alternate uses, zoning,

the size of the property, and income capitalization, a method in which the rental rate is determined by examining comparable properties and adjusting for differences in size, condition, etc. He testified that he also gave "great consideration" to the change in the location of the access point. He valued the property as of April 2004, the approximate time when the 905 property was developed. Based on all of these factors, Weis testified that, in his expert opinion, the change in location of one access point had not affected the value of the 909 property. Weis criticized Robert Harris's valuation, asserting that it contained mathematical and analytical errors and did not examine the value of the property in 2004, before and after the driveway was moved.

{¶ 30} SMS appeals from the jury's verdicts in favor of Harris, raising nine assignments of error.

{¶ 31} The first and second assignments of error state:

THE TRIAL COURT ERRED BY OVERRULING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE IMPOSSIBILITY OF PERFORMANCE DEFENSE.

THE JURY'S VERDICT CONCERNING THE IMPOSSIBILITY OF PERFORMANCE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 32} SMS contends that the City's approval of its development plan, subject to the recommendation of the traffic engineer that the driveway be moved, made it impossible to leave the driveway at its original location. In its first assignment of error, SMS argues that the trial court should have granted its motion for summary judgment on impossibility of

performance. In its second assignment, SMS contends that the jury should have found that it was impossible for SMS to leave the driveway at its original location.

{¶ 33} Any error by a trial court in denying a motion for summary judgment is rendered moot or harmless if a subsequent trial on the same issues raised in the motion demonstrates that there were genuine issues of material fact supporting a judgment in favor of the party against whom the motion was made. *Continental Ins. Co. v. Whittington*, 71 Ohio St.3d 150, 642 N.E.2d 615 (1994), syllabus.

{¶ 34} When an easement is set forth in a written agreement, it is subject to the rules of contract law. *Zagrans v. Elek*, 9th Dist. Lorain No. 08CA009472, 2009-Ohio-2942, ¶ 9, citing *Wimmer Family Trust v. FirstEnergy*, 9th Dist. Lorain No. 08CA009392, 2008-Ohio-6870, ¶ 12. "'Impossibility of performance is an affirmative defense to a breach of contract claim. Impossibility of performance occurs where, after the contract is entered into, an unforeseen event arises rendering impossible the performance of one of the contracting parties.'" (Internal citations omitted.) *MTH Real Estate, L.L.C. v. Hotel Innovations, Inc.*, 2d Dist. Montgomery No. 21729, 2007-Ohio-5183, ¶ 19, citing *Hiatt v. Giles*, 2d Dist. Darke No. 1662, 2005-Ohio-6536, ¶ 34.

{¶ 35} Larry Harris testified that he told SMS during negotiations over the easement that he needed access through the existing driveway to the rear of the 909 property. SMS contends that it was impossible to leave the driveway in place due to the City's conditional approval of its plan. However, the requirement in the easement that SMS comply with all of the City's rules and regulations in developing the property was not equivalent to a grant of permission by Harris to (arguably) exceed the scope of the easement

if the City disapproved of the development plan. In this context, whether SMS had any obligation under the easement agreement to challenge the traffic engineer's recommendation by ordering a traffic study (which SMS apparently had the option to do) was also disputed; the easement did not expressly state such an obligation, but if the jury believed Larry Harris's testimony that he had informed SMS of the importance of this access point, the jury could have reasonably concluded that proceeding with the relocation of the driveway without challenging the City's determination or informing the City of the problem it presented was unreasonable.

**{¶ 36}** Moreover, impossibility of performance occurs where an unforeseen event arises. *Hiatt* at ¶ 34. It was reasonable for the court and jury to conclude that the City's involvement in the development process, including the possibility that it would request or require some changes to the original development plan, was not unforeseen.

**{¶ 37}** The trial court properly refused to resolve the issue of impossibility on summary judgment.

**{¶ 38}** Harris refutes SMS's impossibility argument on the additional basis that the City's granting of the conditional use permit, subject to the traffic engineer's approval, did not have the force of a law, ordinance, regulation, or rule. While perhaps technically correct, the trial court and/or the jury could have reasonably concluded that SMS's treatment of that recommendation (which the City adopted in granting the conditional use) as an order by the City was reasonable under the circumstances presented. The City's traffic engineer stated that the original configuration, with driveways to commercial properties directly across from each other, did not comply with the Highway Access Management Manual and

that it created a safety hazard in the turn lane. Harris's argument that the recommendation did not, in itself, have the force of law, was not dispositive.

{¶ 39} The trial court did not err in denying SMS's motion for summary judgment based on impossibility of performance, and the jury's implicit finding that SMS had breached the contract notwithstanding the City's approval of the plan with a relocated driveway was not against the weight of the evidence.

{¶ 40} The first and second assignments of error are overruled.

{¶ 41} The third and fourth assignments of error state:

THE TRIAL COURT ERRED BY OVERRULING DEFENDANT'S MOTION FOR DIRECTED VERDICT ON PLAINTIFF'S SECOND BREACH-OF-CONTRACT CLAIM.

THE JURY'S VERDICT ON THE PLAINTIFF'S SECOND BREACH-OF- CONTRACT CLAIM WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 42} Harris's second breach of contract claim asserted that the removal and/or relocation of the driveway in the easement area violated the parties' easement agreement. Specifically, the complaint stated that the rights granted to SMS under the easement agreement – which provided for ingress, egress, and parking – were not so broad as to permit the removal of the driveway. In response, SMS contended that the City, in effect, required it to remove the driveway.

{¶ 43} "'The essential elements of a cause of action for breach of contract are the existence of a contract, performance by the plaintiff, breach by the defendant and resulting

damage to the plaintiff.'" (Internal citation omitted*.) Winner Brothers, L.L.C. v. Seitz Elec., Inc.*, 182 Ohio App.3d 388, 2009-Ohio-2316, 912 N.E.2d 1180, ¶ 31 (2d Dist.), citing *Flaim v. Med. College of Ohio*, 10th Dist. Franklin No. 04AP-1131, 2005-Ohio-1515, ¶ 12; *JLJ Inc. v. Rankin & Houser, Inc.*, 2d Dist. Montgomery No. 23685, 2010-Ohio-3912, ¶ 20.

{¶ 44} When considering a directed verdict, the evidence must be construed most strongly in favor of the party against whom the motion is directed, and the motion must be overruled unless reasonable minds could reach no other conclusion but that, under the applicable law, the movant is entitled to judgment in his favor. Civ.R. 50; *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679, 693 N.E.2d 271 (1998).

{¶ 45} Viewed in this manner, the evidence established that Harris had not anticipated or expressly given permission for the removal of the driveway. The language of the easement permitting modifications for ingress and egress was ambiguous as to whether removal and relocation of the curb cut (which was actually in the City's right of way and not in the easement area) were permitted. Harris testified that he had expressly stated during the easement negotiations that he needed to retain truck access to the back of the 909 property. But this condition was not incorporated into the agreement. Harris acknowledged that he was not using the property for manufacturing or truck access when the easement was granted and had not done so for many years prior to that time. Additionally, the representatives of the City who testified at trial stated that they had been unaware of Harris's need for semi-trailer access, despite the City's prior negotiations with Harris about the development of the 905 property. Further, the developer, Samuelson, testified that a fence was required by the easement agreement, at Howell's request, to assure privacy and

limit access to the cars on the auto shop's property; according to Samuelson, the fence called for in the easement agreement would have retained access for cars, but limited access to semi-trailers.

{¶ 46}     There was a factual dispute as to the terms and scope of the agreement. These factual issues were properly resolved by the jury, rather than on directed verdict. The jury's conclusions that the relocation of the driveway had not been contemplated by the easement and that Harris had been harmed thereby were not against the manifest weight of the evidence.

{¶ 47}     The third and fourth assignments of error are overruled.

{¶ 48}     The fifth and sixth assignments of error state:

THE TRIAL COURT ERRED BY OVERRULING DEFENDANT'S MOTION FOR DIRECTED VERDICT ON PLAINTIFF'S FIRST BREACH-OF-CONTRACT CLAIM FOR FAILURE TO PROVIDE WRITTEN NOTICE.

THE JURY'S VERDICT ON PLAINTIFF'S FIRST BREACH-OF-CONTRACT CLAIM WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 49}     In its first breach of contract claim, Harris asserted that SMS breached the easement agreement by failing to give Harris notice of the proposed reconfiguration of the access point.  SMS contends that such notice was not required and, in the alternative, that constructive (or indirect) notice had been given in the process of obtaining the City's approval for the development.

{¶ 50}   The easement was susceptible to more than one interpretation as to whether SMS was required to give written notice of all changes to be made in easement area after the initial phase of construction.   The easement agreement stated that either party intending to make any modification was required to notify the other party in writing, including the estimated cost and two competitive bids.   The other party had ten days to object, or it would be deemed to have approved.   Upon objection of the other party to a proposed modification, the party proposing the change could "proceed at its own expense" or obtain additional bids.   The easement does not expressly state that the party objecting to a proposed modification has a right to stop it.

{¶ 51}   Harris interpreted this provision to entitle the partnership to notice of all proposed changes, whereas the developer (Samuelson) believed that notice was necessary only if contribution to the cost were sought.   No evidence was presented that SMS sought to have Harris contribute to the cost of the curb cut relocation.   The developer also suggested that notice was, in effect, given, considering that the plans submitted to the City and discussed at its hearings contained the modifications recommended by the traffic engineer.

{¶ 52}   Harris does not argue, and the language of the easement agreement does not state, that a party objecting to a proposed modification has a means of preventing it, aside from refusing to contribute to the cost.   However, it is arguable whether Harris intended or SMS believed that it could make any change whatsoever to the easement area, without Harris's approval or input, so long as it paid for the change.

{¶ 53}   The meaning, purpose, and extent of the notice provision contained in the easement agreement presented a question of fact.   Likewise, whether SMS's public

statements in the zoning proceedings about its intent to move the driveway satisfied the notice provision in the agreement was a question of fact. The trial court did not err in refusing to grant a directed verdict on the notice issue, and the jury's conclusion that SMS had violated the notice provision was not against the manifest weight of the evidence.

{¶ 54} The fifth and sixth assignments of error are overruled.

{¶ 55} The seventh, eighth, and ninth assignments of error state:

THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY IT COULD AWARD EXPECTATION DAMAGES.

THE JURY IMPROPERLY AWARDED LOSS-OF-USE AND EXPECTATION DAMAGES.

THE TRIAL COURT ERRED BY OVERRULING DEFENDANT'S MOTION FOR DIRECTED VERDICT ON DAMAGES.

{¶ 56} SMS contends under its seventh assignment of error that the trial court erred in instructing the jury on expectation damages, because there was no dispute that the "damage" to the property was permanent;[3] therefore, the damages were properly calculated based only on the diminution in the value of the property. It also argues under the eighth and ninth assignments of error that the jury improperly awarded loss-of-use and expectation damages and that the trial court should have directed verdicts on these issues.

{¶ 57} In considering a motion for a directed verdict, a court must construe the evidence most strongly in favor of the party against whom the motion is directed, and the

---

[3]Although Harris sought injunctive relief in its complaint, it did not advocate for the restoration of the driveway in the trial court or present any evidence as to the cost of doing so.

motion must be overruled unless reasonable minds could reach no other conclusion but that, under the applicable law, the movant is entitled to judgment in his favor.   Civ.R. 50; *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679, 693 N.E.2d 271. A trial court's decision on a motion for directed verdict presents a question of law, which an appellate court reviews de novo.  *Strategy Group for Media, Inc. v. Lowden,* 5th Dist. Delaware No. 12 CAE 03 16, 2013-Ohio-1330, ¶ 43, citing *Groob v. Keybank,* 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 14.   A directed verdict is appropriate where a plaintiff fails to present evidence from which reasonable minds could find in the plaintiff's favor.  *Id.*

**{¶ 58}**   "'As a general rule, an injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty, and generally, courts have required greater certainty in the proof of damages for breach of contract than in tort.' * * * The damages awarded for a breach of contract should place the injured party in as good a position as it would have been in but for the breach. Such compensatory damages, often termed 'expectation damages,' are limited to actual loss, which loss must be established with reasonable certainty."  *JLJ*,   2d Dist. Montgomery No. 23685, 2010-Ohio-3912, at ¶ 21, citing *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 144, 684 N.E.2d 1261 (9th Dist.1996);  *see also Lynda Hughes Dawson Lumber, Inc. v. Hummel,* 2d Dist. Darke No. 09-CA-07, 2010-Ohio-4918, ¶ 25, citing *F. Enterprises, Inc. v. Kentucky Fried Chicken Corp.*, 47 Ohio St.2d 154, 159, 351 N.E.2d 121 (1976).

**{¶ 59}**   The trial court instructed the jury on "loss of value" and "expectation"

damages. With respect to "loss of value," the court stated:

> If you find that the real property has been permanently or irreparably damaged, and if you find for the Plaintiff, the measure of damage is the difference in the fair market value of the whole property, including improvements thereon, immediately before and immediately after the damage occurred.

**{¶ 60}** With respect to "expectation" damages, the court stated:

> If you find by the greater weight of the evidence that the Defendant breached the easement agreement, and was not excused because of a government order to do so, the Plaintiff is entitled to damages in the amounts sufficient to place it in the *same position* in which it would have been if the easement agreement had been fully performed by the Defendant, to the extent that the damages are reasonably certain and reasonably foreseeable. (Emphasis added.)

SMS objected to the giving of the instruction on expectation damages, as inappropriate based on the evidence presented.

**{¶ 61}** Conflicting evidence was presented about whether, in fact, semi-trailer access to the loading dock at the rear of Harris's property was impeded by the relocation of the driveway. Harris's claim for damages was predicated on the jury's acceptance of his claim that the relocation of the driveway impeded semi-trailer access and thus diminished the fair market value of the property. Larry Harris testified that the other access points were not feasible because one abutted "risky terrain" and the other required semi-trailers to pass perilously close to an overhang from the building. Although Harris had never been told that

he did not have permission to access his property through the new access point on the Tim Horton property, he also did not have express permission to do so. He expressed his opinion that those businesses would not look favorably on semi-trailer traffic through their parking lots, even if such access were feasible. On the other hand, SMS's expert testified that semi-trailer access to the loading dock was feasible through each of the three access points, without undue risk, and that she had run tests with an actual semi-trailer to confirm this fact.

{¶ 62} If Harris's  evidence about the lack of semi-trailer access were believed by the jury, that evidence might have supported an award of damages.   However, as discussed below, the evidence presented by Harris as to the diminution in the value of his property failed to sufficiently demonstrate any damages under Ohio law.

{¶ 63} Evidence from two experts was presented at trial about how damages might be  calculated.  Robert Harris testified for Harris that he calculated the loss of value using a sales comparison method, comparing the value of the 909 property to similar properties along Route 48.  Steve Weis testified for SMS that, continuing to use the property as "office warehouse commercial property" with semi-trailer access and comparing the property to other similar properties, including income capitalization, Harris had suffered no loss of value.

{¶ 64} The jury was free to choose among the various methods of calculating damages about which sufficient evidence was presented.

{¶ 65} Expectation damages are a type of compensatory damages.  *See, e.g., Textron,* 115 Ohio App.3d at 144*;  JLJ Inc.,* 2d Dist. Montgomery No. 23685, 2010-Ohio-3912; *Shah v. Cardiology South, Inc.,* 2d Dist. Montgomery No. 20440,

2005-Ohio-211,¶ 65, citing *Rasnick v. Tubbs*, 126 Ohio App.3d 431, 710 N.E.2d 750 (3rd Dist.1998) ("The purpose of compensatory damages is to put a party who has suffered a breach of a duty he is owed by another in as good a position as the party would have been if he had realized the benefit of his bargain. He is therefore entitled to the value of the 'expectation interest' lost to him."). This comports with the jury instruction on expectation damages given to the jury.

{¶ 66} Harris's evidence on damages related only to the loss of fair market value of the property; it did not offer evidence of lost rental income or any other manner of calculating damages. As such, the jury's award of expectation damages of $142,800 is not supported by the record.

{¶ 67} At oral argument, Harris's attorney suggested that the expectation damage award might have been calculated by multiplying the monthly rent owed by Howell under a 2007 lease agreement[4] ($3,400) by a period of 42 months ($3,400 x 42 = $142,800). Larry Harris testified that Howell had paid everything with the possible exception of several thousand dollars, and counsel stated in closing argument that Howell had paid everything he owed. Later in closing, counsel argued that "the value of the property and the expectation of rental value, was between [$]34 and $3800 a month for the six years that Mr. Howell was there. And that's what we can't do. That's what we can't get * * *."

{¶ 68} Perhaps counsel was suggesting to the jury that the property could have been leased to another tenant at between $3,400 and $3,800 a month but-for SMS's actions and

---

[4] During the course of events, and after the removal of the access, Harris's land contract agreement with Howell was terminated, and a lease with an option to purchase was entered between Howell and Harris.

that Harris therefore suffered damages. But there was no evidence that Harris desired, intended, or attempted to offer the property for rent or, if it did, whether the property would have or could have been rented or what the terms would have or could have been, or how a term of 42 months was relevant. And Robert Harris rejected any attempt to utilize the "income approach" in valuing the property because he "never found out about the – any kind of rental income that the property was throwing off."

{¶ 69} The jury was not permitted to use a speculative calculation that had no support in the record and was not established with reasonable certainty. Harris's only evidence of its damages was its expert's opinion that the fair market value of the 909 property was diminished by $160,000 (the figure awarded for "loss of use" or loss of value, not expectation damages) based on the size of the easement area, the removal of the driveway in the easement area, and Harris's presumed inability to use that land for semi-trailer access as a result of the driveway relocation.

{¶ 70} Harris's expert also stated that there "could be more" damages (more than the reduction in the value of the property) if "you have to redesign the building for a different use;" he did not attempt to quantify these damages. This statement was an incorrect characterization of the law of damages and called for speculation by the jury. If Harris were awarded damages equal to the diminution in the fair market value of the property, he would be entitled to no additional damages for equipping the property for another use, because an award for the reduction in fair market value would put Harris in the "same position" as he would have been in but for the breach. If damages attributable to another use of the property – e.g., reduced future rental income – had resulted in a larger damage calculation,

Harris might have been entitled to seek damages at that level. But Harris did not offer evidence to support any damage calculation other than the diminution in fair market value. Because there was no basis to award damages beyond the loss of fair market value (styled as "loss of use" damages in the jury instructions and verdict forms), and because, based on the evidence presented, the claim for damages for reduction in fair market value would have fully compensated Harris for its loss, the trial court erred in instructing the jury on and permitting the jury to award additional "expectation damages."

{¶ 71} SMS also contends that the award of compensatory damages was not proper, because "Loss of Use" was not a proper measure of damages in this case. The jury's verdict form used this term. However, because Harris's claim to a reduction in value of the property was based on his claim that it could no longer be accessed or "used" by semi-trailers, we see no prejudice to SMS in the use of this term.

{¶ 72} Additionally, SMS claims that the reduction in fair market value testified to by Robert Harris and reflected in the "loss of use" award did not tie the loss to the time of the alleged breach, and thus was not proper proof of damages. In other words, SMS claims that there was no evidence presented as to the difference in fair market value immediately before and after the removal of the driveway in late 2004 or early 2005.

{¶ 73} It is well-established that, where a party suffers permanent or irreparable damage to its property, "the measure of damages is the difference in market value of the property as a whole, including the improvements thereon, before and after the injury." *Ohio Collieries Co. v. Cocke*, 107 Ohio St. 238, 248, 140 N.E. 356 (1923); *Case Leasing & Rental, Inc. v. Ohio Dept. of Natural Resources*, 10th Dist. Franklin No. 09AP-498, 2009-Ohio-6573,

¶ 27.

{¶ 74}  With respect to the measure of damages for temporary injuries – or injuries to property that are "susceptible of repair" – *Ohio Collieries* further held that the proper measure of damages was the reasonable cost of restoration plus reasonable compensation for the loss of use between the time of injury and the restoration, unless the cost of restoration exceeded the difference in the market value of the property before and after the injury, in which case the difference in market value was the proper measure of damages.  *Ohio Collieries* at 248-249; *Case Leasing* at ¶ 27.  This portion of the *Ohio Collieries* holding related to the measure of temporary damages has since been limited.  "In an action based on temporary injury * * *,  a plaintiff need not prove diminution in the market value of the property in order to recover the reasonable costs of restoration, but either party may offer evidence of diminution of the market value of the property as a factor bearing on the reasonableness of the cost of restoration."  *Martin v. Design Construction Services, Inc.*, 121 Ohio St.3d 66, 2009-Ohio-1, 902 N.E.2d 10, ¶ 24; *see also Northwestern Ohio Natural Gas Co. v. First Congregational Church of Toledo,* 126 Ohio St. 140, 150-151,184 N.E. 512 (1933).

{¶ 75}  The *Ohio Collieries* measure of damages for permanent injury to property was unchanged by *Martin* or *First Congregational Church*; that measure is the difference in market value of the property before and after the injury.  Although Harris sought injunctive relief in his complaint, i.e., the restoration of the original driveway, by the time of trial, neither party suggested or presented evidence about the possibility of restoring the original driveway or the cost of such restoration. Thus, the trial court and the jury properly utilized the

measure of permanent damages in considering the amount of compensatory damages in this case.

**{¶ 76}** At the 2012 trial, Robert Harris testified that he had "found six fairly recent sales" in the vicinity of the 905 and 909 South Main properties "to use as comparable land sales," although his report apparently primarily relied on only four comparable sales. He did not go into more detail about the timing of the sales in his trial testimony, but he stated that detailed information about these sales was included in his report. The record does not reflect that the report was ever offered as an exhibit despite its being referred to by the witness. Although the report was transmitted by the Clerk to this court, apparently as part of the "record on appeal," pursuant to App.R. 9(A)(1) and (B)(6)(f) and App.R. 10, the trial court had, without objection, explicitly not allowed its admission at trial. Usually, a reviewing court cannot consider an exhibit unless the record demonstrates that the exhibit was admitted into evidence in the lower court. *See, e.,g., Patio Enclosures, Inc. v. Four Seasons Marketing Corp.*, 9th Dist. Summit No. 22458, 2005-Ohio-4933, ¶ 66.

**{¶ 77}** Harris was questioned about pages 3 and 65 of the report, and it appears that these pages were projected or otherwise visible to the jury during his testimony. Robert Harris did not testify about the dates of sale, prices, or other specific information related to the comparable sales contained on these pages. It is perhaps a distinction without a legal difference that evidence on those pages was perceived visually by the jury rather than auditorily. Although the pages themselves should have been offered and become part of the record, SMS did not object to Harris's reference to the content of these two pages as part of the basis for his opinion, and Harris was cross-examined about the information. We

therefore will consider that content as part of the record on appeal.

{¶ 78}     Robert Harris did not testify that the 909 property was worth a certain amount  in 2004 before the removal of the driveway in the easement area and a lesser amount after its removal in late 2004 or early 2005.   Rather, he testified that, in 2012, when he prepared his report, the 909 property was worth one amount if it included the easement area and the semi-trailer access and another amount without the area and access.   Although page 65 of Robert Harris's report demonstrated that one (of four) of the comparable sales used in his calculations occurred in 2004, no reasonable interpretation of the "before value" referenced in his testimony and report permits the conclusion that this value represented the value of the 909 property in 2004 or 2005.   The other comparable sales upon which he based his calculations occurred in 2007, 2011, and 2012, and Robert Harris's trial testimony suggested that he was assigning a current value to the 909 property of $725,000.

{¶ 79}   After he arrived at this initial value for the property, Robert Harris sought to attach a separate value to the .47 acre easement area, using a value-per-square-foot measure gleaned from the comparable sales and adjusted for the topography of the parcels.   Robert Harris concluded that the easement area should be valued at $8 per square foot.   He then multiplied this value by the total area of the easement to arrive at a value of $160,000. Because Harris no longer had use of the easement to access its property, Robert Harris deducted the value he attributed to the land comprising the easement ($160,000) from the "before value" ($725,000) to arrive at his "after value" of $565,000.   None of Robert Harris's testimony was directed at comparing the value of the property in 2004 or 2005 to its value immediately after the damage.   In fact, Harris testified that he "didn't value the

property in 2004" but that he "valued it as of 2012" and that he believed that "it would be less [in 2004] than $8 [per square foot that he valued it at in 2012], but that would be conjecture."

{¶ 80}    According to the evidence presented, the City of Englewood sought to develop the 905 property, and perhaps other properties around it, for commercial use.   In any area, but particularly in an area where development is underway, there may be significant variations in property values over an eight-year period; the difference in the value of the 909 property, with and/or without the easement area and semi-trailer access, might have increased or decreased significantly between 2004/2005 and 2012.   Robert Harris even testified that property values in the area had gone up since 2003.   Robert Harris stated that he "was asked to value the property before access was removed and also to form an opinion of value as to how much that real estate had declined in value."   This was in line with the jury instructions which said the "measure of damages is the difference in fair market value of the whole property, including improvements thereon, *immediately before* and *immediately after* the damage occurred."   (Emphasis added.)   However, the actual opinion as to loss of value was the 2012 value of the property with access versus without access.   Based on the standard set forth by the supreme court for valuing permanent damage to property and reflected in the jury instructions, Harris's damages should have been based on the property's value before and after the removal of the driveway in 2004 or 2005, not its 2012 value with and without the easement area and the driveway.

{¶ 81}    Because the testimony and evidence about damages did not provide a sufficient basis for the jury to value the 909 property immediately before and after the relocation of the driveway and to thereby determine the damages Harris suffered in

accordance with *Ohio Colliers*, it was error to award compensatory damages based on the reduced value of the property.

**{¶ 82}** Finally, SMS argues that the trial court erred in overruling its motion for a directed verdict on damages. SMS requested a directed verdict at the close of Harris's case, and renewed its motion before the matter was submitted to the jury. The trial court overruled the motions, without elaboration.

**{¶ 83}** A decision on a motion for directed verdict can present a difficult decisional process coming in the midst of trial, when the judge and jury have heard considerable contradictory testimony over several days from both lay and expert witnesses, all subject to cross-examination, concerning numerous causes of action and claimed damages. However, in light of our discussion above about Harris's failure to present sufficient evidence of any damages, we must also conclude that the trial court erred in failing to grant SMS's motions for a directed verdict on damages.

**{¶ 84}** The seventh, eighth, and ninth assignments of error are sustained.

**{¶ 85}** The jury's findings that SMS breached its contract with Harris will be affirmed, but its awards of damages will be reversed. The matter will be remanded to the trial court for entry of a judgment consistent with this opinion.

. . . . . . . . . .

FROELICH, P.J., FAIN, J. and DONOVAN, J., concur.

Copies mailed to:

Richard A. Boucher
Julia C. Kolber

Lauren E. Grant
Thomas T. Czechowski
Kevin P. Braig
Gregory P. Mathews
Hon. Frances E. McGee