[Cite as *Levine v. Kellogg*, 2020-Ohio-1246.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Steve Levine et al., | : | |
| Plaintiffs-Appellees,<br>Cross-Appellants, | : | No. 18AP-694 |
| | : | (M.C. No. 2016CVF-27321) |
| v. | | |
| | : | (REGULAR CALENDAR) |
| Ken Kellogg, | | |
| | : | |
| Defendant-Appellant,<br>Cross-Appellee. | : | |

D E C I S I O N

Rendered on March 31, 2020

**On brief**: *Law Offices of Thomas Tootle Co., LPA*, and *Thomas Tootle*, for plaintiffs-appellees/cross-appellants. **Argued**: *Thomas Tootle*.

**On brief**: *Law Offices of James P. Connors*, and *James P. Connors*, for defendant-appellant/cross-appellee. **Argued**: *James P. Connors*.

APPEAL from the Franklin County Municipal Court

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Ken Kellogg, from a judgment of the Franklin County Municipal Court finding in favor of plaintiffs-appellees, Steve and Sharon Levine, on their action to recover a security deposit, and finding against appellant on his counterclaim for breach of contract.

{¶ 2} On August 29, 2016, appellees filed a complaint against appellant alleging they had entered into a rental agreement with appellant for the residential premises

located at 6764 Brampton Court, Dublin.  Per the terms of the agreement, appellees gave appellant a security deposit in the amount of $1,570.  It was alleged that appellees terminated the rental agreement on July 5, 2016, returning the premises to appellant "in the same or better condition as when the Rental Agreement began but for reasonable wear."  (Compl. at ¶ 3.)  According to the complaint, appellant failed to return the security deposit as required by the rental agreement.  Appellees alleged a violation of R.C. 5321.16 and sought damages in the amount of $1,570, as well as an additional "statutory penalty" award of $1,570; appellees further sought the payment of reasonable attorney fees.

{¶ 3}  On November 29, 2016, appellant filed an answer and counterclaim.  In the counterclaim, appellant alleged that pets belonging to appellees had "urinat[ed] and defecat[ed] in and around the indoors of the premises," and that appellees "were unable to completely remove the stains and odors."  (Counterclaim at ¶ 15.)  Appellant alleged he had presented a bill to appellees "demonstrating that he incurred damages in the total amount of $3,489," but that appellees "failed and refused to pay the damages which exceed the security deposit."  (Counterclaim at ¶ 16.)  It was further alleged appellees had failed to disclose damage to the garage door "caused by their Honda CRV or some other automobile striking the garage door while they were tenants in the premises."  (Counterclaim at ¶ 17.)  The counterclaim alleged causes of action for breach of contract and misrepresentation.

{¶ 4}  The matter came for a bench trial beginning March 1, 2018.  Appellees presented the testimony of three witnesses, Kathie Underwood, and appellees Sharon and Steve Levine.  Underwood, who manages residential rental properties, testified she had reviewed [p]laintiff's [e]xhibits B, E, and F, consisting of photographs and a video depicting the interior of 6764 Brampton Court.  Underwood stated the wear and tear depicted in those exhibits was not unusual for carpeting of seven years or greater.  When asked her opinion as to how often carpet is replaced in a leased premise, Underwood responded: "As a general rule, every seven to nine years."  (Tr. at 23.)

{¶ 5}  From 2009 through 2016, appellee Sharon Levine (individually "Ms. Levine") and her husband resided at 6764 Brampton Court, renting the premises from appellant under a series of one-year lease agreements.  At trial, Ms. Levine identified [p]laintiff's [e]xhibit A as a copy of the last lease agreement she and her husband signed

(dated May 1, 2015) regarding the property. In 2016, Ms. Levine and her husband notified appellant they would be vacating the residence at the end of the current lease. Appellant subsequently informed appellees he was "going to sell the home," and that "he wanted to bring in a realtor to discuss the proceedings for selling the home and what would happen as they were bringing people in to show the property." (Tr. at 60.) On April 30, 2016, appellant brought a realtor to the residence for a walk-through.

{¶ 6} Appellees moved out of the residence on July 5, 2016. Appellees hired Stanley Steamer to clean the carpeting and the company provided carpet cleaning services on July 6, 2016. Ms. Levine denied any recollection of damage to the garage door and stated the door was functioning when they moved out.

{¶ 7} On cross-examination, Ms. Levine testified she allowed her pet cats to roam freely around the house. When asked whether the pets urinated and defecated inside the property, she responded: "In the litter box, not on the carpet." (Tr. at 91.) Ms. Levine acknowledged the pets had vomited on the carpet. She denied attempting to remove cat urine and feces from the carpeting.

{¶ 8} Appellee Steve Levine (individually "Levine") testified regarding his tenancy at 6764 Brampton Court, including the events surrounding the move out in 2016. Levine identified [p]laintiff's [e]xhibit D as photographs taken by a realtor, Carolyn Redinger, during a walk-through of the house in 2016. On the date appellees moved out of the residence (July 5, 2016), Levine did a walk-through of the premises with appellant. Levine testified that appellant indicated some areas were dirty. Levine patched a hole in the drywall caused by movers; he spackled over the work but did not paint over it. Levine subsequently received a letter from appellant, identified at trial as [p]laintiff's [e]xhibit K, citing several repairs appellant "wanted us to make after we moved out." (Tr. at 186.) Levine stated "[w]e had no idea there was a ding of any kind or dent or anything in that garage door." (Tr. at 183-84.)

{¶ 9} On cross-examination, Levine testified that he "never saw the cats urinate in the home unless in the litter box," and "never saw them defecate in the home unless in the litter box." (Tr. at 192.) Levine agreed that it was his decision to have the carpets professionally cleaned prior to moving out.

{¶ 10} Brian Deyo, the owner of Deyo Overhead Door Service, testified on behalf of appellant. Deyo identified [d]efendant's [e]xhibit Nos. 17 and 18 as photographs depicting the garage door of the residence he had "looked at last year." He noted damage to the door, stating that "something * * * hit it from the inside because it was bowed out." (Tr. at 127.) According to Deyo, the damage reflected in the photographs was not normal wear and tear. On March 15, 2017, Deyo provided an estimate to appellant regarding the replacement of door panels in the amount of $899. On cross-examination, Deyo stated he had not performed any work on the garage door.

{¶ 11} Edgar Ramirez, the owner of Ramirez Flooring, LLC, testified as to the condition of carpeting depicted in a series of photographs admitted as [d]efendant's [e]xhibit 15. He stated the carpet was "[v]ery dirty. It appeared to have pee from a dog or cat." (Tr. at 144.) Ramirez opined the condition of the carpet did not constitute reasonable wear and tear. He stated it is not possible to fully clean and return carpeting to its normal condition where stains from animal urine or defecation has remained on the carpet for a period of time, and that such carpet "should be replaced." (Tr. at 145.)

{¶ 12} Ramirez identified an affidavit he signed providing an estimate to appellant for the installation of carpet and padding in two rooms of appellant's rental property. The estimate, prepared on March 14, 2017, was for the installation of "Mohawk berber" carpeting in the amount of $2,041.53. (Tr. at 142.) According to Ramirez, the typical life expectancy of a high-grade berber carpet from Mohawk is "30 years." (Tr. at 146.)

{¶ 13} Redinger, a realtor with "[t]hirty plus years" experience, was involved in the sale of appellant's property. (Tr. at 222.) In April 2016, Redinger did a walk-through of the property with appellant, and took photographs at that time. Redinger testified that the carpeting "was heavily pet stained in the family room area." (Tr. at 226.) At trial, Redinger identified pet stains depicted in the photographs. Redinger expressed concern to the owners that "[p]et staining could affect the sale of the home." (Tr. at 227.) The carpet "was cleaned upon move-out," and Redinger took more photographs on July 7, 2016. (Tr. at 240.) She testified the photographs depicted stains remaining on the carpet. Redinger opined that "stains such as this do not come out, whether [or not] its professionally cleaned." (Tr. at 242.)

{¶ 14} Redinger discussed three options with appellant and his wife for addressing the condition of the carpet relative to a house sale. The first option involved installing new carpet while the current tenants still occupied the premises, which involved the risk of "the pets * * * stain[ing] * * * all over again." A second option was to replace the carpeting after the tenants moved out, with the risk of uncertainty as to "how the market would be." A final option was to "do a compensation for the carpet situation in pricing." (Tr. at 228.)

{¶ 15} Redinger recommended reducing the listing price of the home by $3,000 (from $197,900 to $194,900) "to compensate for the carpeting." (Tr. at 229.) She stated the $3,000 figure represented "the amount of damage to reflect in the purchase price." (Tr. at 230.) According to Redinger, appellant received $3,000 less on the sale price of the property due to the staining on the carpet. Redinger obtained a buyer for the premises, and the buyers arranged to have the carpeting replaced prior to moving into the house.

{¶ 16} Redinger testified the homeowners made concessions to the buyer on the sale with respect to foundation work in the basement, whereby appellant and his wife agreed to pay for repairs to the I-beams. During redirect examination, when asked whether the amount paid for repairs "would have been monies [the owners] had to pay in order to sell the house at the price that it sold for," Redinger responded "[y]es." (Tr. at 256.)

{¶ 17} On cross-examination, Redinger did not recall "any problem with the garage door." (Tr. at 251.) According to Redinger, no one knew about an issue with the garage door at the time of the offer and acceptance in May 2016.

{¶ 18} Amy Nagel resides on Brampton Court and when appellees were out of town she "would watch their cats and get their mail." (Tr. at 281.) She watched the cats approximately "[t]en times or more." (Tr. at 282.) According to Nagel, the cats "had free roam of the house." (Tr. at 288.) She testified that "[o]n an occasion or two when I would watch them I would have to clean up poop or puke." (Tr. at 290.) Nagel observed stains downstairs, which she described as "[s]taining from a pet," and which she did not consider to be normal wear and tear. (Tr. at 289.) Nagel subsequently noticed "[d]ark

spots * * * in the family room" when she would "go down to clean the kitty litter box." (Tr. at 290-91.)

{¶ 19} Molly Kellogg, appellant's wife, testified she and her husband lived at the Brampton Court residence from 1992 until 2009. In 2001, Kellogg and appellant installed "Mohawk berber * * * high grade carpet" with "a 25-year warranty." (Tr. at 301.) In 2009, Kellogg and appellant decided to rent out the house and appellees began tenancy that year. Kellogg identified photographs taken of the residence in 2009 and described the condition as "immaculate" when they moved out. (Tr. at 304.)

{¶ 20} Kellogg went to the house on July 7, 2016 and observed the carpet "was very well-stained." (Tr. at 309.) Kellogg "was quite upset" because she "thought the carpets had been cleaned. It looked * * * like there was still heavy staining for having the carpets being cleaned." (Tr. at 311.) Kellogg prepared a letter to appellees outlining damages, including a cleaning charge of $100 and a charge of $75 to repair drywall damage. Kellogg testified the total damages exceeded the amount of the security deposit.

{¶ 21} Kellogg and appellant met with Redinger in April 2016 to begin the process of selling the residence. Redinger "mentioned to us that the carpet in the middle bedroom and, in particular, the family room was heavily stained. And when we were discussing the listing price of the home, she mentioned that we could either ask a listing price and replace the carpet or we could lower the price of the home by $3,000 and allow the buyer to put their own carpet in." Kellogg and appellant "decided to lower the asking price of the home so a buyer could replace the carpet or flooring as they needed." (Tr. at 315.)

{¶ 22} Kellogg and appellant listed the home for $194,900. The buyers requested Kellogg and appellant remedy a structural issue in the basement as "some I-beams needed to be replaced." They paid a contractor "just over $3,000" to remedy the issue. (Tr. at 316.) Kellogg and appellant also paid to remedy a radon issue, and "then increase[d] the * * * listing price of the home to accommodate for that." (Tr. at 316-17.) Kellogg testified they suffered a $3,000 loss as a result of the carpeting, and that they would have otherwise listed the house for $197,900.

{¶ 23} On cross-examination, Kellogg testified the carpet was installed in 2001, and that the carpeting was 15 years old when appellees moved out. Kellogg did not have an invoice for the Mohawk carpet that was originally installed.

{¶ 24} Appellant, who testified on his own behalf, stated the carpeting he and his wife installed in the Brampton Court residence was made by Mohawk and carried "a 25-year guarantee." (Tr. at 329.) According to appellant, there were no problems with the carpeting in 2009, and the house was in "immaculate, excellent condition" at that time. (Tr. at 328.)

{¶ 25} In April 2016, after appellant and his wife made the decision to sell the residence, he was surprised to see dark stains in the family room. On two occasions, appellant observed "poop right outside of the litter box on the family room carpet." Appellant also observed that someone had placed tea bags on the carpet, and his realtor explained the purpose of using tea bags in such a manner was "to pull odors and potential stains out of the carpet." (Tr. at 345.)

{¶ 26} Redinger, recommended three options to address the condition of the carpet; replace the carpeting while the tenants were still there, install new carpeting after the tenants vacated, or "have the buyer make their own decision what they want to do and * * * just devalue by $3,000." (Tr. at 347.) Based on Redinger's advice, appellant and his wife reduced the price of the house by $3,000 due to the condition of the carpet. Appellant testified that the selling price of the home eventually increased by approximately $3,000 after he paid for remedies related to a radon system and the installation of I-beams on a basement wall. (Amount correct? I-beams and radon)

{¶ 27} Appellant prepared a list of items that needed repair at the time appellees moved out. Appellant discussed the carpet stains with Levine during the walk-through on July 5, 2016. According to appellant, the stains did not come out even after the professional cleaning. He further testified there was a dent on the left side of the garage door.

{¶ 28} On cross-examination, appellant testified he did not have a copy of the Mohawk carpet warranty or the original invoice. Appellant did not replace damaged tiles in the kitchen, nor did he replace the garage door; he stated the damaged garage door did not affect the sale price of the residence. Appellant testified the buyer made an offer of $194,900, but the house sold for $197,900 because "there was a seller concession of closing costs." (Tr. at 402.) According to appellant, the buyer was unaware of a

foundation issue when they made their initial offer. Appellant acknowledged he never provided appellees 72-hour written notice concerning landscaping issues.

{¶ 29} By entry filed September 10, 2018, the trial court found in favor of appellees on their claim appellant wrongfully withheld the security deposit, and the court further found against appellant on his counterclaim. By separate entry also filed on September 10, 2018, the trial court awarded appellees attorney fees in the amount of $12,957.

{¶ 30} On appeal, appellant sets forth the following seven assignments of error for this court's review:

> 1. The trial court erred by granting judgment in favor of plaintiffs Steve and Sharon Levine on their claim for return of a security deposit and on defendant Ken Kellogg's counterclaim for damages under the lease agreement and R.C. 5321.05.
>
> 2. The trial court erred by finding, as a matter of law, that defendant Ken Kellogg, as landlord, did not incur any damages because he did not pay "out of pocket" for repairs to his property that was damaged by his tenants, and, further, by failing to award him damages arising from the lease agreement and R.C. 5321.05.
>
> 3. The trial court erred by holding that in order for a landlord to establish compensable damages, he must pay "out of pocket" for repairs necessitated by damage caused by his tenants to his property.
>
> 4. The trial court's judgment, following a bench trial, for the plaintiffs on their security deposit claim and against the landlord defendant on his counterclaim for damages under the lease and R.C. 5321.05 was against the manifest weight of the evidence.
>
> 5. The trial court erred by concluding as a matter of law that "The average life of carpet is 8 years," because this conclusion is unsupported by any admissible evidence or Ohio law.
>
> 6. The trial court erred by denying defendant's motion to preclude plaintiffs' expert witness from testifying, and by allowing a "real estate manager," Kathie Underwood, to testify on behalf of the plaintiffs as an expert on carpet even though she was not qualified as an expert on any issue and offered no material, relevant, or reliable opinions.

7. The trial court erred by granting attorney fees to plaintiffs.

{¶ 31} Appellees have filed a cross-appeal, asserting the following cross-assignment of error:

> The Trial Court erred when it reduced Plaintiff-Appellees'
> attorney fee in an action to recover a security deposit by $675
> and refused to reimburse Plaintiff a $300 expert witness fee
> for defending a meritless counterclaim.

{¶ 32} Appellant's first six assignments of error are interrelated and will be considered together. Under these assignments of error, appellant contends the trial court erred in: (1) granting judgment in favor of appellees on their claim for return of a security deposit and denying appellant's counterclaim for damages under the lease agreement and R.C. 5321.05, (2) finding appellant did not, as a matter of law, incur any damages because he did not pay "out of pocket" for repairs to his property damaged by appellees, (3) holding that, in order for a landlord to establish compensable damages, he must pay "out of pocket" for repairs necessitated by damage caused by his tenants to his property, (4) rendering a judgment that was against the manifest weight of the evidence, (5) concluding that the average life of carpet is eight years, and (6) denying appellant's motion to preclude appellees' expert witness from testifying as an expert on carpet.

{¶ 33} In general, "[a]n award of damages in a landlord-tenant dispute is governed by a manifest-weight-of-the-evidence review." *Hensel v. Childress*, 1st Dist. No. C-180100, 2019-Ohio-3934, ¶ 24. Under this standard, "[a] verdict supported by some competent, credible evidence going to all the essential elements of the case must not be reversed as being against the manifest weight of the evidence." *Sonis v. Rasner*, 8th Dist. No. 101929, 2015-Ohio-3028, ¶ 52, citing *Domaradzki v. Sliwinski*, 8th Dist. No. 94975, 2011-Ohio-2259, ¶ 6; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

{¶ 34} By contrast, this court's review over "purely legal questions is de novo." *Williams v. McMillian*, 8th Dist. No. 107570, 2019-Ohio-3275, ¶ 6. In this respect, "[a]n appellate court reviews a question of law challenging the trial court's measure of damages de novo." *MacDonald v. Authentic Invests., LLC,* 10th Dist. No. 15AP-801, 2016-Ohio-4640, ¶ 40.

{¶ 35} Conflicts between a landlord and tenant "are governed by R.C. Chapter 5321, which embodies what is commonly known as the Ohio Landlord-Tenant Act." *Whitestone Co. v. Stittsworth*, 10th Dist. No. 06AP-371, 2007-Ohio-233, ¶ 7, citing *Vardeman v. Llewellyn*, 17 Ohio St.3d 24, 26 (1985). That Act "codifies Ohio law regarding rental agreements for residential premises and governs the rights and duties of both landlords and tenants." *Id.* The provisions of R.C. 5321.16(B) and (C) "address termination of the tenancy, including the rights and duties of the landlord and tenant as to the disposition of rental security deposits." *Id.*

{¶ 36} R.C. 5321.16 states in part:

> (B) Upon termination of the rental agreement any property or money held by the landlord as a security deposit may be applied to the payment of past due rent and to the payment of the amount of damages that the landlord has suffered by reason of the tenant's noncompliance with section 5321.05 of the Revised Code or the rental agreement. Any deduction from the security deposit shall be itemized and identified by the landlord in a written notice delivered to the tenant together with the amount due, within thirty days after termination of the rental agreement and delivery of possession.
>
> * * *
>
> (C) If the landlord fails to comply with division (B) of this section, the tenant may recover the property and money due him, together with damages in an amount equal to the amount wrongfully withheld, and reasonable attorney fees.

{¶ 37} Thus, in accordance with R.C. 5321.16(B), "a landlord is obligated to return funds held as a security deposit unless those funds are applied toward the payment of past due rent or reduced by damages suffered by the landlord because of the tenant's failure to maintain the premises." *Warner v. Evans,* 9th Dist. No. 27536, 2015-Ohio-2022, ¶ 7.

{¶ 38} R.C. 5321.05 sets forth "the obligations of the tenant with respect to upkeep and maintenance of an apartment holding a tenant liable for extraordinary damages which are not the result of normal wear and tear." *Bibler v. Nash*, 3d Dist. No. 5-05-09, 2005-Ohio-5036, ¶ 18.

{¶ 39} R.C. 5321.05 states in part:

> (A) A tenant who is a party to a rental agreement shall do all of the following:
>
> * * *
>
> (6) Personally refrain and forbid any other person who is on the premises with his permission from intentionally or negligently destroying, defacing, damaging, or removing any fixture, appliance, or other part of the premises;
>
> * * *
>
> (C)(1) If the tenant violates any provision of this section, other than division (A)(9) of this section, the landlord may recover any actual damages that result from the violation together with reasonable attorney's fees.

{¶ 40} A landlord "may only recover damages from the tenant for violations of R.C. 5321.05 or because of violations of the lease." *Kelley v. Johnston*, 4th Dist. No. 01CA5 (Nov. 14, 2001). Under Ohio law, "tenants are liable for waste; however, they are generally not liable to landlords for damages attributed to ordinary wear and tear," and "[i]f damage is not of the type specified in R.C. 5321.05 or the lease, it will normally be considered ordinary wear and tear." *Id. See also Hensel* at ¶ 26 ("A tenant is under a duty to return the premises to the landlord in substantially as good a condition as when received, but the landlord is not entitled to receive compensation for damages resulting from reasonable wear and tear."). Further, "the landlord bears the burden of submitting sufficient evidence to link the damages to the tenant." *Johnston*. In order to establish this necessary link, "the landlord must generally present evidence regarding the condition of the premises both before the tenant moves in and after he moves out." *Estie Invest. Co. v. Braff,* 11th Dist. No. 2017-L-172, 2018-Ohio-4378, ¶ 26.

{¶ 41} In the instant case, the lease agreement between the parties provided for a security deposit of $1,570 "to guarantee the return of the premises to the Owner * * * in the same or better condition as when accepted by the Resident, reasonable wear expected." The lease agreement further provided in part that the residents shall personally refrain from "intentionally or negligently destroying, defacing, damaging, or removing any fixture, appliance, or other part of the premises." (Plaintiff's Ex. A at 2.) Addendum

C to the lease agreement, titled "pet agreement," required an additional deposit of $150 with respect to two cats and included language stating in part that "resident agrees to immediately pay for any damage, loss or expense caused by their pet."

{¶ 42} On appeal, appellant's primary contention is that the trial court erred in holding he failed to establish any right to damages because he did not pay out-of-pocket for repairs to the property. Appellant points to language in the trial court's decision in which the court, addressing appellant's argument that his residence was devalued for sale due to the condition of the carpet, stated appellant "chose not to replace it prior to any sale" and "is not out any monies." (Decision at 2.) The trial court made findings that, upon advice of a real estate agent, appellant "listed his home for $3,000.00 less due to the condition of the carpet," and "sold his home for $3,000.00 over list price." The court concluded appellant "made the choice not to replace the carpet prior to the sale of his home," and he "is not out any monies and is not entitled to keep any of the security deposit." (Decision at 3.)[1] Appellant argues that, contrary to the trial court's determination, damages are not defined to require a party to pay out-of-pocket for repairs in order to establish a right to damages.

{¶ 43} In *Booth v. Duffy Homes, Inc.*, 10th Dist. No. 07AP-680, 2008-Ohio-5261, ¶ 20, *modified* 185 Ohio App.3d 260, 2009-Ohio-6767, this court noted that an early Ohio Supreme Court case, *Ohio Collieries Co. v. Cocke*, 107 Ohio St. 238 (1923), "established the general rule for the measure of damages in cases involving injury to real property." In *Ohio Collieries*, the Supreme Court held the measure of damages for an injury of a permanent or irreparable nature is "the difference in the market value of the property as a whole, including the improvements thereon, before and after the injury." *Id.* at 248. With respect to actions involving temporary damage to property, i.e., "injury is susceptible of repair," the Supreme Court held that the measure of damages is "the reasonable cost of restoration, plus reasonable compensation for the loss of the use of the property between the time of the injury and the restoration, unless such cost of restoration exceeds the difference in the market value of the property before and after the injury, in which case the difference in market value becomes the measure." *Id.* at 248-49.

---

[1] With respect to appellant's claim of damage to the garage door, the trial court similarly held in its decision that appellant "did not make any repairs, the home was sold 'as is' and [appellant] is not out any monies." (Decision at 2.)

{¶ 44} The holding in *Ohio Collieries* regarding the measure of temporary damages "has since been limited." *L.G. Harris Family Ltd. Partnership I v. 905 S. Main St./Englewood, LLC,* 2d Dist. No. 25871, 2014-Ohio-1906, ¶ 74. Specifically, " '[i]n an action based on temporary injury * * *, a plaintiff need not prove diminution in the market value of the property in order to recover the reasonable costs of restoration, but either party may offer evidence of diminution of the market value of the property as a factor bearing on the reasonableness of the cost of restoration.' " *Id.*, quoting *Martin v. Design Constr. Servs.,* 121 Ohio St.3d 66, 2009-Ohio-1, ¶ 24. Further, "[w]hile evidence of loss in market value of the property may be relevant, the essential inquiry is whether the damages sought are reasonable." *Martin* at ¶ 25.

{¶ 45} Ohio courts have addressed the issue of whether damage to leased premises constitutes ordinary wear and tear (as opposed to waste) in the context of considering a tenant's obligations under R.C. 5321.05. In *Hensel,* the First District Court of Appeals held in part:

> When determining ordinary wear and tear, the court must look to the circumstances of each case. In *Cincinnati Oakland Motor Co. v. Meyer,* [37 Ohio App. 90 (1st Dist.1930)], decided prior to the adoption of R.C. 5321.05, this court discussed ordinary wear and tear as it related to a heating system. This court looked at the age of the heating system, its expected life span, whether any repairs were conducted due to normal deterioration, and whether the tenant had damaged the heating system in any way which would be considered waste.
>
> Other districts have defined ordinary wear and tear in the negative based on the tenant's statutory obligations under R.C. 5321.05. If damage is not the kind specified in R.C. 5321.05 or the lease, then it is normally considered ordinary wear and tear. * * * But, it is still the landlord's burden to link any damage to a failure of the tenant to fulfill his statutory obligation.
>
> In *Bibler* [*v. Nash*, 3d Dist. No.] 5-05-09, 2005-Ohio-5036, at ¶ 18-21, the trial court went through each individual item of damage claimed by the landlord and determined whether the item exceeded ordinary wear and tear, and then held the tenants responsible for the excess damage.

(Citations omitted.) *Id.* at ¶ 27-29.

{¶ 46}   Under the facts in *Hensel,* a landlord brought an action for damages against the defendant-tenant after the tenant vacated the leased premises.  During a bench trial, a remodeling contractor, retained by the landlord to prepare an estimate for the cost to restore the premises to a rentable condition after the tenant moved out, testified regarding "all of the work which needed done on the house—including carpet, hardwood flooring, wall, painting, and appliances."  *Id.* at ¶ 30.  The contractor "admitted that he did not know what condition the house was in before [the tenant] moved in," and "[h]e also admitted that a lot of the damages he noted on his estimate could not be seen in the photographs."  *Id.* at ¶ 31.  The contractor further testified, however, "the damage was beyond ordinary wear and tear."  *Id.*  The contractor "initially estimated the damages would cost $28,000 to fix, but [the landlord] reduced the estimate to $15,625 after accounting for wear and tear."  *Id.*  The trial court ultimately found in favor of the landlord and awarded the landlord damages.

{¶ 47}   On appeal, the tenant argued the trial court failed to account for ordinary wear and tear in awarding damages to the landlord.  The appellate court, finding ample evidence that the damage was not ordinary wear and tear, noted the trial court considered testimony from witnesses "of the expected 'life span' of the hardwood floors and the walls, and whether the damage was the result of deterioration or [the tenant's] failure to fulfill his R.C. 5321.05 duties."  *Id.* at ¶ 36.  The reviewing court also noted the trial court "expressly considered what constituted ordinary wear and tear when deciding the amount of damages," and that the trial court reduced the amount awarded to account for ordinary wear and tear.  *Id.* at ¶ 37.  The court thus deemed it "clear from the trial court's entry that it considered ordinary wear and tear in its award of damages, and in fact reduced the amount owed based on ordinary wear and tear."  *Id.* at ¶ 38.

{¶ 48}   In the instant case, it is undisputed appellant chose not to replace the carpet prior to the sale of the residence in 2016.  Appellant did, however, present testimony that the realtor recommended a reduction in the list price of the house due to staining on the carpet, and witnesses for appellant testified that the list price reflected a

reduction (in the amount of $3,000) as compensation to the buyer based on the condition of the carpet.[2]

{¶ 49} While the trial court found appellant was not out any monies because he did not replace the carpeting, we do not find such fact dispositive of whether appellant could show any "actual damages," as contemplated by R.C. 5321.05(C), as a result of a violation under R.C. 5321.05(A). Rather, even accepting a scenario in which a landlord fails to make repairs, such party could still show entitlement to damages based on proof that property damage (beyond normal wear and tear) resulted in a reduction in the market value of the property. *See, e.g., Cubbedge-Parker v. Dillard,* 6th Dist. No. L-15-1245, 2016-Ohio-3367, ¶ 10 (rejecting appellant's argument that trial court erred in finding appellee incurred cost to replace removed shrubbery where appellee acknowledged she had not replaced shrubbery and was no longer owner of property; although "appellee will not directly incur the cost of replacing the shrubbery * * * she has nonetheless suffered from a reduction in the market value of the property and, by extension, a reduction in the potential sale price of the property").

{¶ 50} Appellees argue, and we agree, that the proper measure of damages would be the lesser of the cost of repair and the difference in market value caused by the damage. *See, e.g., Ohio Collieries* at 239. *See also Curtis v. Vazquez,* 11th Dist. No. 2003-A-0027, 2003-Ohio-6224, ¶ 29 (noting "the general rule set forth in *Ohio Collieries* * * * that a property owner is only entitled to the lesser of the cost of repair and the difference in market value"). However, as argued by appellant, the trial court appears to have applied an "out of pocket" measure of damages in concluding that appellant's choice to forego replacing the carpet meant he was "not out any monies" (and therefore suffered no damages).

{¶ 51} Again, the fact appellant failed to replace the carpeting is not dispositive of whether he could prove actual damages; as noted, there was evidence presented by appellant that, upon advice of the realtor regarding carpet stains, appellant and his wife

---

[2] We note that, while appellant presented testimony that the condition of the carpet resulted in a decision to reduce the sale price of the residence, the evidence does not indicate that purported damage to the garage door resulted in a reduction of the sale price. Rather, appellant's realtor testified that no one was aware of an issue with the garage door at the time of the acceptance of the offer to purchase the home. Appellant, who stated he did not replace the garage door, similarly testified that any damage to the garage door did not affect the sale of the residence.

made the decision to reduce the price of the house as compensation to account for the condition of the carpet. On review, we conclude the trial court erred in applying an improper measure of damages (i.e., based on whether appellant incurred out-of-pocket costs for repairs).

{¶ 52} We also note the trial court's decision does not specifically address whether the evidence presented by appellant supported a finding that appellees caused damage to the carpet that exceeded normal wear and tear. On this issue, and as noted under the facts, both parties presented evidence at trial as to the condition of the carpet at the time appellees vacated the premises.

{¶ 53} Appellees both testified that their cats did not urinate or defecate outside the litter box. Appellees' other witness, Underwood, an individual with residential lease management experience, testified on direct examination that the wear and tear depicted in [p]laintiff's [e]xhibits B, E, and F was usual for carpeting of at least seven years. On cross-examination, Underwood agreed that the carpet depicted in some of the photographs "is not in excellent condition." (Tr. at 37.) Underwood further stated she would not consider pet stains from urine to constitute normal wear and tear. With respect to one of the photographs (Defendant's Ex. No. 15 G), Underwood stated "[t]here are stains on the carpet that need cleaned." When asked to assume, "hypothetically," that the stains depicted on the photo were the result of pet urine and defecation, she agreed such stains would not constitute normal wear and tear. (Tr. at 45.)

{¶ 54} Appellant's witness, Ramirez, the owner of Ramirez Flooring, testified that the condition of the carpet as depicted in various photographs (Defendant's Exs. 15 A, B, C, and D) was "[v]ery dirty," and it appeared to be the result of pet urine. (Tr. at 144.) Ramirez stated the condition of the carpet would not constitute reasonable wear and tear, and that it "should be replaced." (Tr. at 145.)

{¶ 55} Redinger testified that the carpeting in the family room area was "heavily pet stained." (Tr. at 226.) According to Redinger, even after the carpeting was professionally cleaned, it remained "severely stained." (Tr. at 244.) Redinger believed the pet staining "would affect the sale of the home" and, as previously noted, she recommended reducing the price of the home by $3,000 to reflect the amount of damage. (Tr. at 228.)

{¶ 56} Thus, the parties presented the trial court with competing evidence as to whether the condition of the carpet represented normal wear and tear or exceeded the reasonable wear and tear standard. We note that courts in general have held that odors and damage caused by pet urine and/or defecation stains do not constitute ordinary wear and tear. *See*, *e.g.*, *Fornof-Lippencott v. Powell*, 2d Dist. No. 94-CA-11 (Jan. 18, 1995) (urine stain caused by cats enclosed in basement not ordinary wear and tear); *Clark v. Craenen*, 10th Dist. No. 89AP-416 (Nov. 28, 1989) (damage to property, including smell in house emanating from soiled carpeting as a result of fecal matter and urine stains by dogs, "does not represent ordinary wear and tear").

{¶ 57} Here, it is not clear if the trial court found credible evidence presented by appellant that the stains were caused by cat urine and defecation. Further, whether the condition of the carpet represented injury to appellant "in excess of normal wear and tear was a question for the trial court, and one the court did not specifically answer." *Fornof-Lippencott*. We conclude, therefore, that remand is necessary for the trial court to determine, upon consideration of a "reasonable wear and tear standard," *Bibler at* ¶ 20, whether the tenants may be subject to liability for extraordinary damages under R.C. 5321.05 and, in the event the evidence supports such a determination, for application of the appropriate measure of damages for temporary injury to property.[3]

{¶ 58} Accordingly, we find merit with arguments presented under appellant's second and third assignments of error, and we sustain those assignments of error. Further, having found the trial court applied an incorrect standard in determining the issue of damages, thereby necessitating a remand to consider the issues addressed above (including whether appellant has shown actual damages), appellant's first assignment of error is sustained in part. However, to the extent appellant requests this court to enter judgment in his favor as a matter of law, we overrule that portion of the first assignment of error.

{¶ 59} Under the fourth assignment of error, appellant challenges the trial court's judgment in favor of appellees as against the manifest weight of the evidence. In light of

---

[3] As noted under the facts, appellant presented testimony at trial as to the replacement cost of new carpeting based on an estimate ($2,041.53) provided by Ramirez. Courts have held, however, that claims for damages such as replacement carpet should account for "depreciation due to reasonable wear and tear, quality, and life expectancy of the carpet." *Calanni v. Stowers*, 8th Dist. No. 106618, 2018-Ohio-4025, ¶ 48.

our disposition of the first three assignments of error, the question of whether the judgment in favor of appellees is against the manifest weight of the evidence is rendered moot.

{¶ 60} We do, however, address several issues raised on appeal that merit brief discussion for remand purposes. During oral argument, counsel for appellant acknowledged that several damage issues raised in appellate briefing are no longer contested. Specifically, while the fourth assignment of error asserts the lease agreement required the tenants to maintain the landscaping, counsel acknowledged there was no evidence indicating appellant provided 72-hour notice to appellees as required by the terms of that agreement. Counsel also represented during oral argument that appellant was no longer seeking damages with respect to appliances (i.e., dishwasher and washing machine).[4]

{¶ 61} Appellant argues, under the fifth assignment of error, the trial court erred in concluding the average life of carpet is eight years. Related to this assignment of error is the primary issue raised under appellant's sixth assignment of error, in which he contends the trial court erred in denying his pre-trial motion to preclude appellees' witness, Underwood, from testifying as a witness.

{¶ 62} In its decision, the trial court stated in its conclusions of law that "[t]he average life of carpet is 8 years." (Decision at 3.) While the trial court does not indicate the evidence relied on for that conclusion, appellant suggests the court's finding was based on the testimony of Underwood who, according to appellant, was not qualified under Evid.R. 702 to render an opinion as to issues related to carpet, including an opinion regarding the average life span for carpet.

{¶ 63} In order to testify as a witness under Evid.R. 702, the testimony of a witness must meet three requirements: (1) the testimony "must relate to matters beyond the knowledge or experience possessed by laypersons; (2) [the witness] must be qualified as an expert by specialized knowledge regarding the subject matter of the testimony; and, (3) [the] testimony must be based on reliable scientific, technical, or other specialized

---

[4] The trial court, in addressing appellant's counterclaim, determined the evidence failed to show appellant provided appellees with 72-hour notice "to correct any defects regarding the landscaping." The court also found appellant failed to present any evidence that appellees "caused an unreasonable amount of damage to both the dishwasher and the washing machine that exceeded normal wear and tear." (Decision at 4.)

information."  *Laketran Bd. of Trustees v. Mentor*, 11th Dist. No. 2001-L-027, 2002-Ohio-3496, ¶ 54, citing Evid.R. 702.  Expert testimony under Evid.R. 702 "is admissible in the form of an opinion to aid the court in arriving at a correct determination."  *Copper & Brass Sales, Inc. v. Plating Resources, Inc.*, 9th Dist. No. 15563 (Dec. 9, 1992).  In general, "[a] trial court's ruling as to the admission or exclusion of expert testimony is within its broad discretion and will not be disturbed absent an abuse of discretion."  *Biro v. Biro*, 11th Dist. No. 2006-L-068, 2007-Ohio-3191, ¶ 28.

{¶ 64} At trial, Underwood testified that she is employed by the Wooden Companies and is responsible for "the leases and the management of their boutique collection of properties."  (Tr. at 18.)  Underwood, who is licensed by the Columbus Board of Realtors, was previously employed for 25 years by Bellows and Associates, a property management company, as well as for five years with DeSantis Property Management.

{¶ 65} As noted under the facts, in preparation for her testimony, Underwood reviewed photographs offered as exhibits by appellees depicting the residence at 6764 Brampton Court, as well as a video taken during a walk-through of the residence.  At trial, Underwood testified the wear and tear depicted in [p]laintiff's [e]xhibits B, E, and F was not unusual for carpeting of 7 years or greater.  She stated, in her experience, tenants are charged for damage on a "pro-rated" basis (i.e., not based on replacement cost).  She defined pro-rated as meaning the "life expectancy of the carpet, how many years they lived there."  (Tr. at 26.)  Underwood also opined that, as a general rule, carpeting is replaced "every seven to nine years."  (Tr. at 23.)

{¶ 66} Appellant argues the trial court failed to act in its key role as a gatekeeper to determine not only whether Underwood was qualified as an expert, but also to determine what opinions were to be elicited.  According to appellant, the trial court permitted this witness to testify as to irrelevant matters.

{¶ 67} With respect to appellant's gatekeeper argument, we would note that, in the context of a bench trial, reviewing courts "afford broad leeway to the trial court in deciding the reliability of particular expert testimony" under Evid.R. 702.  *Knott v. Revolution Software, Inc.*, 181 Ohio App.3d 519, 2009-Ohio-1191 (5th Dist.), ¶ 46. Further, " '[w]hen a matter is tried before the court in a bench trial, there is a presumption that the trial judge "considered only the relevant, material, and competent evidence in

arriving at its judgment unless it affirmatively appears to the contrary." ' " *In re Fair*, 11th Dist. No. 2007-L-166, 2009-Ohio-683, ¶ 66, quoting *Jackson v. Herron*, 11th Dist. No. 2003-L-145, 2005-Ohio-4046, ¶ 28, quoting *State v. White*, 15 Ohio St.2d 146, 151 (1968).

{¶ 68} Here, the record indicates Underwood was licensed by the Columbus Board of Realtors, had 30 years of experience in real estate, and had participated in approximately "5,000 plus" move-out procedures involving tenants.  (Tr. at 20.) Underwood, who reviewed photographic exhibits and a video of the Brampton Court residence prior to her testimony, stated she has dealt with issues involving unreasonable damage to carpeting "[a] thousand times."  (Tr. at 25.)  Under Ohio law, in order to "qualify as an expert witness, a potential witness does not have to be the most knowledgeable or the best witness regarding the topic at hand." *In re B.D.T.K.,* 9th Dist. No. 24792, 2009-Ohio-6079, ¶ 25, citing *Scott v. Yates*, 71 Ohio St.3d 219, 221 (1994).  In this respect " '[t]he individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function.' "  *Id.,* quoting *State v. Hartman*, 93 Ohio St.3d 274, 285 (2001).  Upon review, we find no abuse of discretion by the trial court in denying appellant's motion to preclude the testimony at issue.

{¶ 69} Appellant also seeks reversal based on the trial court finding the average life of carpet is eight years.  We note, however, the trial court's ruling in favor of appellees on appellant's claim for damages was not dependent on that finding but, rather, based on the court's determination that appellant was not out any monies because he chose not to replace the carpet.  Further, to the extent this issue may arise on remand (depending on the trial court's resolution of whether the claimed damage exceeded normal wear and tear), we would simply note that the relevant consideration with respect to useful life would appear to be evidence before the court as to the reasonable life expectancy of the carpet at issue (i.e., evidence as to the useful life of the type of carpeting in appellant's residence).

{¶ 70} Based on the foregoing, appellant's fifth and sixth assignments of error are not well-taken and are overruled.

{¶ 71} Under his seventh assignment of error, appellant asserts the trial court erred in awarding attorney fees to appellees under R.C. 5321.05.  In their single

assignment of error on cross-appeal, appellees also raise a challenge to the trial court's award of attorney fees, asserting the court erred in deducting a portion of their request for attorney and expert witness fees. Both assignments of error, however, are rendered moot by our disposition of appellant's first, second, and third assignments of error, requiring a remand for the trial court to re-examine whether appellant suffered any actual damages and, if so, to determine whether the evidence establishes damages in excess of the unreturned deposit amount. Those determinations, in turn, go to the issue of whether appellant wrongfully withheld any portion of the security deposit and whether he may be liable for damages equal to twice the amount wrongfully withheld and for some appropriately scrutinized amount of attorney fees. *See, e.g.*, *Vardeman* at 29 (noting "where the trial court finds that the landlord has properly withheld the portion of the security deposit in question, it is reasonable to conclude that the tenant has not been damaged and may claim neither * * * double damages * * * nor the attorney fees as set forth in R.C. 5321.16(C) ").

{¶ 72} Based on the foregoing, appellant's first assignment of error is sustained in part and overruled in part, appellant's second and third assignments of error are sustained, appellant's fifth and sixth assignments of error are overruled, and appellant's fourth and seventh assignments of error, as well as appellees' single assignment of error on cross-appeal, are rendered moot. Accordingly, the judgment of the Franklin County Municipal Court is reversed, and this matter is remanded for further proceedings in accordance with law, consistent with the decision.

*Judgment reversed and cause remanded.*

BRUNNER and NELSON, JJ., concur.

_____