[Cite as *Tillimon v. Hollstein*, 2024-Ohio-3346.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Duane J. Tillimon

Appellant

v.

Janice Hollstein, et al.

Appellees

Court of Appeals No.  L-23-1277

Trial Court No.  CVG022010374

**DECISION AND JUDGMENT**

Decided: August 30, 2024

\* \* \* \* \*

Duane J. Tillimon, Pro se.

Zachary M. Shaffer, for appellee, Chaz Hollstein

\* \* \* \* \*

**MAYLE, J.**

{¶ 1} Appellant, Duane Tillimon, appeals the October 31, 2023 judgment of the Toledo Municipal Court, Housing Division, finding in favor of appellees, Janice Hollstein, Jenna Hollstein, and Kole Rodriguez, on his complaint for damages.  He also asks that we order the trial court to sanction appellee, Chazz Hollstein, for failing to appear at trial in response to a subpoena.  Janice, Jenna, and Rodriguez did not file appellate briefs.  Chazz, who was dismissed as a defendant in the underlying case, has filed a brief that responds only to the assignment of error relating to the subpoena.  He

does not address the assignments of error relating to the merits of the case. For the following reasons, we affirm.

## I. Background and Facts

## A. Pretrial proceedings

{¶ 2} In August 2022, Tillimon filed a complaint for money damages against Janice, Jenna, "JOHN DOE, BOYFRIEND OF JENNA HOLLSTEIN," and Chazz. He later amended his complaint to substitute Rodriguez for John Doe. In the complaint, Tillimon alleged that he owns a home on Woodmont Road in Toledo, all four defendants "were tenants at all times relevant[,]" Janice, Jenna, and Chazz were his tenants under written leases, and Rodriguez was a subtenant under an oral agreement with Janice and Jenna. Chazz moved out of the house in 2017, but "left items behind for Janice Hollstein to use." Janice and Jenna moved out in August 2022. Tillimon alleged that Janice, Jenna, Chazz, and Rodriguez "left the house both dirty and damaged beyond normal wear for which they now owe [him] the reasonable cost of cleaning and repairs" and that "the damages to the property were intentional and have caused [him] to suffer willful and malicious injuries." The damages he claimed in the "Security Deposit Accounting letter and [] preliminary Move-Out Inspection Report" attached to his complaint included broken and damaged doors and windows; carpeting "stained and torn beyond repair" throughout the house; damaged vinyl and tile floors; damaged and missing window treatments; ceiling fans, window air conditioners, a microwave, and a sink that did not work; lightbulbs that needed to be replaced; missing light fixtures; items left behind in the basement and garage; a damaged garage door and opener; dirty and damaged window

2.

screens; "scraps [sic] and holes, and marks and stains" on the walls; general yard maintenance; and "containers full of water throughout the house[.]"

{¶ 3} After all defendants were served and failed to file answers, Tillimon moved for default judgment. In response, Chazz, through an attorney, sought leave to file a responsive pleading and filed a motion to dismiss. The court granted Tillimon default judgments against Janice, Jenna, and Rodriguez. It also granted Chazz's motion to dismiss.

{¶ 4} Tillimon submitted proof of his damages by affidavit. In his affidavit, he claimed that he originally rented the house on Woodmont Road to Chazz. Chazz eventually wanted to move out and asked if Janice could assume the lease. Janice had an eviction on her credit history, so Tillimon agreed to "allow [Janice] to sign his lease and to move into the house" with plans to eventually have Janice sign her own lease. When he met with Chazz and Janice at the house "to have Janice sign Chazz's extended lease[,]" the house was in "good condition." At the time, Jenna was 14 years old and not a signatory on the lease. However, when she turned 18, Tillimon made her sign the lease as well. Tillimon was unaware that Rodriguez was living at the house when Jenna signed the lease.

{¶ 5} When Janice, Jenna, and Rodriguez moved out, Janice left a note on the counter saying that she did not clean the basement or garage because "the contents were already their [sic] when she rented the house." When Tillimon contacted Janice, she told him that Chazz was not living at the house but was "continuing to use the basement and garage." Tillimon "tracked down" Chazz, who denied using the basement and garage.

3.

Chazz claimed that Rodriguez "was an auto mechanic and using the basement and garage as [a] repair shop." Tillimon suggested that all parties meet at the house for a walkthrough inspection to determine who was responsible for which damages, but they all declined. According to Tillimon, "[i]n [his] 44 years as a landlord, [he] never got a dwelling back from a tenant needing so much cleaning and repairs needed to make the house re-rentable."

{¶ 6} Attached to Tillimon's damages affidavit were (1) numerous receipts for supplies and equipment that he purchased; (2) "bids" for work that still needed to be done to the property, but that he had not completed or paid for; (3) contracts for work with a handyman he hired to perform cleanup and repairs with notations on each indicating that Tillimon had paid the handyman; (4) the "move-out inspection report[s]" he sent to Janice, Jenna, Rodriguez, and Chazz after they left the property; and (5) a receipt for the cost of photographs he took to document the condition of the house.[1] He separated the damages into "Cleaning and Repairs Beyond Normal Wear . . ." for the yard, the garage, and the house.

{¶ 7} In the yard, he alleged that "the yard was not recently mowed, the landscaped areas were over-grown with weeds and ivy, and trash was strewn throughout the yard, behind the garage, and between the garage and the neighbor's fence."

---

[1] Although exhibit 5 to Tillimon's damages affidavit refers to "80 Photographs" he took that "represent[ed] the condition the house was left in by the defendants when the house was vacated[,]" there is no indication that the photos or copies of them were included with the original damages affidavit, the trial court struck the photos when Tillimon tried to admit them as trial evidence, and Tillimon did not proffer them at any point, so they are not in the record before us.

4.

{¶ 8} In the garage, he alleged that it "looked like a 1950's gas station repair shop" with used tires, parts, supplies, tools, containers of used motor oil, broken window glass, a damaged window, and trash all over. The garage door was inoperable and the remotes were missing. Janice did not respond to his request to return the remotes so that he could try to repair the garage door instead of replacing it.

{¶ 9} In the house, he alleged that there was (1) soot all over the walls, carpet, cabinets, and appliances; (2) doors off hinges, broken doors, and missing doorknobs; (3) broken, missing, and damaged drapes, blinds, and hardware; (4) carpet damage from what he thought was heavy furniture being slid over the carpet and some type of fire in a bedroom; (5) "over 123 picture hooks, screws and nails . . ." that he removed from the walls; (6) broken windows and screens; (7) damaged and inoperable appliances; and (8) missing smoke detectors. Tillimon said that before he rented the house to Chazz, "the house was completely repainted inside and outside and had new carpeting installed" and "the appliances were all in excellent working condition . . . ."

{¶ 10} The magistrate assigned to review Tillimon's damages claim recommended awarding him a judgment of $11,961.87 against Janice, Jenna, and Rodriguez, jointly and severally. None of the parties filed objections to the magistrate's decision. The trial court adopted the magistrate's decision in part and awarded Tillimon judgment against Jenna and Rodriguez in the amount of $11,961.87, jointly and severally. However, it determined that Janice was not properly served, so it vacated the default judgment against her. About two weeks later, the trial court filed what it called a nunc pro tunc judgment entry reinstating the default judgment against Janice and awarding Tillimon judgment

5.

against her in the amount of $11,961.87, jointly and severally with Jenna and Rodriguez. The court found that it was mistaken about Janice not being properly served, so it adopted the magistrate's decision granting Tillimon a judgment against Janice.

{¶ 11} Janice, Jenna, and Rodriguez each eventually filed Civ.R. 60(B) motions to set aside the default judgments. The trial court granted Jenna's and Rodriguez's motions on February 1, 2023, and Janice's on June 29, 2023. Tillimon did not file notices of appeal from either trial court decision.

{¶ 12} After the court vacated the default judgments, Tillimon filed a motion for summary judgment. The trial court denied his motion because genuine issues of material fact remained for trial.

### B. Chazz's subpoena

{¶ 13} On October 16, 2023, a week before the October 23 trial date, Tillimon filed a praecipe for a subpoena to have Chazz testify at trial. An entry on the docket says "Bailiff filed return of service as follows: Bailiff unable to serve a copy of the Subpoena upon CHAZZ HOLLSTEIN, for the following reason: Other. Hearing scheduled for Monday, October 23, 2023 and the subpoena was received by the Bailiffs Department on Thursday, October 19.2023. Left subpoena on front door."

{¶ 14} At 11:40 p.m. on October 22, Chazz's attorney filed a motion to quash the subpoena. In it, he argued that the subpoena was untimely and unduly burdensome. First, he pointed out that the trial had been scheduled for over two months, but Tillimon waited until a week before trial to issue the subpoena, and he did not get the subpoena until one business day before trial. He also informed the court that he had preexisting

6.

plans to be out of the state for "personal reasons" the day of trial and, if he were not out of state, would not have sufficient time to request leave from work. He also argued that he was not a party to this case and had no knowledge of the underlying dispute because he "has not resided in the property at issue for numerous years prior to the events leading to this complaint." Finally, he informed the court that Tillimon apparently did not provide notice of the subpoena to the other parties or their attorneys, as required by Civ.R. 45(A)(3).

{¶ 15} Chazz did not appear for trial. Tillimon did not request a continuance to secure his testimony or bring his absence to the court's attention in any substantial way.

{¶ 16} The afternoon of October 23, after the trial was over, Tillimon filed a response opposing Chazz's motion to quash. He first argued that it was incorrect to refer to Chazz as a "nonparty" because Chazz was named in Rodriguez's cross-complaint, and he subpoenaed Chazz "immediately after he received the court's Judgment Entry" denying his summary judgment motion. He claimed to have emailed Chazz's attorney to ask if the attorney planned to represent Chazz at trial on the cross-claim and if Chazz planned to testify at the trial, but Chazz's attorney did not respond. When he did not respond, Tillimon issued his subpoena for Chazz. Without Chazz's testimony, "a key question before the court was not answered, that is [were] there existing damages when Chazz Hollstein vacated the house?" (Emphasis deleted.) Tillimon argued that the trial court should sanction Chazz because he did not provide an explanation for why he could not appear, his attorney could have moved for a continuance, and, because it seemed that

7.

Chazz "just didn't want to testify against his mother, . . ." sanctions in the amount of damages Tillimon was requesting were warranted.

{¶ 17} Three days later, Tillimon filed a memorandum in support of his motion for sanctions. He argued that Chazz and his attorney should be sanctioned for failing to appear at trial because they knew about the trial date for two months, they did not produce any evidence of a circumstance beyond Chazz's control preventing him from testifying, and only Chazz "could definitively explain the condition of the premises at the time he surrender[ed] possession to [Janice]."

## C. Trial

{¶ 18} At the bench trial, to accommodate his speech difficulties, Tillimon presented his case-in-chief primarily by affidavit. In his affidavit, he testified that he owns the house on Woodmont Road in Toledo. At the time the house was vacated in late July 2022, Janice, Jenna, and Rodriguez lived there. Before it vacated the default judgments, the trial court had determined that Tillimon's "proven damages" were $11,961.87, based on the damages affidavit he had previously filed with the court and was incorporating into his trial affidavit. His actual damages were $15,402.85, but he "depreciated the cost by 33% to avoid issues involving 'normal wear' and 'betterment.'" He claimed that the damages he sought did not include lost rents, damages from a neighbor's tree falling on the house in June 2022, or damages that existed when Janice took possession of the house from Chazz in late January 2017.[2] He also said that no one

---

[2] In his affidavits, Tillimon refers to Janice moving into the house on Woodmont Road in 2017, but Janice first signed a lease for the property in 2015.

8.

who resided in the house informed him of damage that existed when they took possession, as required by the lease.

{¶ 19} According to Tillimon, when he went to the house to get the keys after getting a voicemail from Janice telling him that she, Jenna, and Rodriguez had moved out, he "found a note blaming Defendant Chazz Hollstein for all the damages to the house." His inspection of the house discovered heavy damage and "a lot" of personal property "abandoned and left behind in the house." He also "discovered the entire house was covered with a layer of soot[,]" which he thought came from someone "cooking or manufacturing something . . ." in the rear bedroom. He offered into evidence "light fixture globes" as evidence of the soot. He offered to walk through the house with Janice, Jenna, and Rodriguez for an inspection, but none of them accepted his offer. Attached to his trial affidavit as exhibits were his damages affidavit and its exhibits.

{¶ 20} After presenting his trial and damages affidavits, Tillimon rested.

{¶ 21} As soon as Tillimon rested, Rodriguez moved for a directed verdict. He argued that Tillimon did not present any evidence that he "was a signatory to any contracts or anything at all to that" or "did anything to that property whatsoever." Essentially, he said that Tillimon did not have evidence that he was Tillimon's tenant, and if he was Janice's or Jenna's subtenant, it would be up to them to file a complaint against him. In response, Tillimon argued that he "didn't sue Kole Rodriguez because of the breach of contract. [He] sued him because he did damage. You can't walk by somebody's house, throw a brick through the front window and say I'm not liable

9.

because I'm not on the lease. . . . If you do the damage, you do the damage; you're liable."

{¶ 22} The trial court granted Rodriguez's motion. After reviewing both of Tillimon's affidavits, it found "no direct evidence tying [Rodriguez] to any actual damage in this case."

{¶ 23} Following Rodriguez's dismissal, Janice's and Jenna's attorneys each cross-examined Tillimon. On cross, Tillimon expanded on some of the damages to the property. He said that the house had "[b]linds, drapery and hardware, rods, all that" on all of the windows when Janice moved in and denied that it had only one curtain each on a kitchen window and the side-door window. The garage was "full of junk[,]" including "oil, car parts, [and] used tires, . . ." from someone "repairing automobiles in the garage." There were also windows "busted out[;]" "[o]ne whole section of glass was missing, another section somebody put in plastic, not glass." Three smoke detectors that had been installed in the house were missing. Because of the damage to the walls and some of the rooms being painted without permission, Tillimon was asking Janice and Jenna to pay for the whole house to be repainted. He also wanted to replace the refrigerator, range, washer, dryer, and microwave because "[a]ll those items did not work. They were damaged and beat up." There was nothing in the garage or basement that belonged to Tillimon when Janice moved in, but there were items in the basement that belonged to other people. In the note that she left when she moved out, Janice told Tillimon that everything in the garage and basement was there when she moved in. Tillimon thought it was her obligation to move out things that were at the house when she moved in.

10.

**{¶ 24}** Regarding the tree that fell on the house, Tillimon said that it damaged the porch and a "false gable," but did not damage anything inside the house, and none of the living areas were affected. He had the tree removed "immediately" and "replaced the roof probably within a week."

**{¶ 25}** Tillimon denied Janice telling him that they were moving out because Jenna had respiratory issues and needed whole-house air conditioning. According to him, the air conditioner broke in June 2023 and the part needed to repair it was backordered. Janice and Jenna moved out before the air conditioner could be repaired. Tillimon claimed that the house was in a livable condition when they moved out. He additionally denied (1) leaving the house without a working garage door for six months; (2) receiving any complaints about the property from the city while Janice lived there; (3) installing gutters on the house after a complaint to the city; and (4) discussing water leaks with Janice. He did not recall having a conversation with Janice about suing previous tenants. He thought that he had replaced the carpet before Chazz moved into the house in 2017 but could not be sure because he did not have his records with him.[3]

**{¶ 26}** In addition to the receipts in his damages affidavit, Tillimon included "bids" for work that he had not yet paid for. He "personally went in and got . . ." the bids for various items and services at Home Depot and Lowe's.

**{¶ 27}** Tillimon knew that Jenna was a minor when she moved into the house. When she turned 18, Tillimon had her sign a lease addendum. He did not do an

---

[3] Although Tillimon refers to Chazz moving into the house on Woodmont Road in 2017, Chazz signed a lease for the property in 2015.

11.

inspection for damages with her either when she initially moved in as a minor or when she signed the lease addendum as an adult. Instead, Jenna took the house, as counsel put it, "'as is' pursuant to the addendum that [Tillimon] gave to her[.]"

{¶ 28} In his redirect, Tillimon said that "this was the most heavily damaged house [he] ever got back from a tenant" in the 44 years he had been a landlord. He said that "[t]he garage was just filled with junk; tires, car parts, motor oil, broken windows, broken garage door, broken garage door opener. It looked to [him] like somebody was running a repair shop out of the garage and the basement because the basement had similar junk in it." He included Rodriguez as a defendant in the lawsuit because "his job was working in a body shop someplace. So [Tillimon] assume[d] he did all that damage to the garage and the basement or most of it in the basement and all that's in the garage."

{¶ 29} Tillimon reiterated that the tree that fell on the house did not damage the interior of the house—it only "crushed" the awning over the porch and a "'looks' gable" that was not over an interior room—and that the damages he was seeking reimbursement for "were related to the lifestyle of [his] tenants."

{¶ 30} Tillimon also reiterated that he originally rented the house to Chazz, who was a good tenant, but eventually wanted to move out. He agreed to let Janice take over Chazz's lease. When he met with Chazz and Janice at the house, "[t]here were no damages to the house." Much of the furniture that he saw at the house at that time was still there after Janice moved out, and Tillimon had to dispose of it. He said that the furniture was old and "really heavy," and it looked like "they dragged the furniture across the carpeting and tore the carpeting all over."

12.

{¶ 31} After Tillimon, Jenna testified. She was 12 years old when she moved into the house on Woodmont Road and 19 years old when she moved out. When she moved in, the house "was not finished" and the garage and basement were "full of stuff." Jenna was never able to park her car in the garage because "[i]t was full of stuff[,]" like it was when she moved in. The carpet in her room was "really gross and [she] thought it was getting replaced." Jenna did not personally complain to Tillimon about the state of the carpet, but she knew that a complaint had been made. The carpet was not replaced while she lived there. The appliances in the house were used. She never used the microwave but knew that it "didn't work for a long time." Janice "definitely" installed blinds or drapes in the house because it did not have any. Tillimon came over "[v]ery little" to make repairs.

{¶ 32} When Jenna turned 18, Janice gave her a single piece of paper to sign that essentially said that she agreed to abide by the terms of the lease. She did not receive a full copy of the lease from Tillimon. It was Jenna's understanding that she and Janice would be evicted if she did not sign the lease addendum. She confirmed that she did not walk through the house with Tillimon to identify any issues when she signed the lease addendum.

{¶ 33} Jenna confirmed that the tree "did not puncture any inside walls but it definitely punctured the roof . . . " when it fell on the house. As a result, she "was scared it was going to rain or anything bad was going to happen or that it would give out. So [she] felt the need to move as soon as possible."

13.

{¶ 34} Jenna has asthma, and she said that there were "multiple times" when "the air-conditioning wasn't working and it would get really humid and it would almost be impossible to breathe." She thought that Janice had told Tillimon about the air conditioner issue. When Jenna moved out, the air conditioner had not been working for at least a month. The breathing issues this created were part of the reason Jenna left.

{¶ 35} Jenna thought that all of the damages Tillimon mentioned that were "not left over from when [she] moved in was general wear and tear. To [her] knowledge nothing extreme happened." When she and Janice moved out, they "cleaned it a lot and stuff. So [Tillimon] saying that there was cobwebs and stuff and soot on the walls [she] know[s] isn't true because we cleaned them. And it was just overall not livable when we left at all."

{¶ 36} On cross, Jenna admitted that she never wrote Tillimon a letter telling him about any damages that existed when she moved in. She also said that she, Janice, and Chazz all moved into the house together.

{¶ 37} Finally, Janice testified. She said that she did not take over Chazz's lease for the Woodmont Road house; she and Chazz "signed the lease at the same time."

{¶ 38} Janice claimed that she and Tillimon had a conversation around the time she and Chazz moved in about him suing former tenants of the Woodmont Road house. Tillimon told her "that as soon as he won his lawsuit on the previous tenants that he was going to paint the house and put carpet in." He also told her that the former tenants left the appliances that were in the house and Janice could choose whether to keep them. The microwave in the house never worked, and the washer and dryer, which Chazz gave her

14.

when he bought a new set for himself, both worked when she moved out. Janice denied doing any damage to the appliances.

{¶ 39} According to Janice, Tillimon came to the house the day after the tree fell and said that everything was fine. However, when someone came to inspect the roof a couple of days later, "he was shocked" that people were living there and told Janice to "get [Jenna] out now" from her bedroom below the area where the tree hit because "[i]t's not safe for people to be up there . . . ." Janice had safety concerns with the house before the tree fell on it.

{¶ 40} Janice moved out because the air conditioner was not working and Tillimon told her "that because he had no insurance on the house when the tree fell that he wasn't going to be able to pay to get the air-conditioning fixed now because the tree had fallen." Although she said that the air conditioner was not working, she also said that she "told [Tillimon] it was definitely going out, you could tell. But it worked well enough . . . ."

{¶ 41} Janice asked Tillimon to let her out of the lease, which he agreed to. Janice summarized her conversations with Tillimon about moving out:

> I spoke to him about getting out of the lease on the day when he came out to look at the tree and we'd spoke. . . . And I told him that Jenna wanted to leave and that I thought I was going to move out. And he said that's fine, just let me know. . . . [O]ne of the last times I talked to him he said just leave the keys, and that was it. . . . [H]e said if you want to stay a couple extra days and clean, that's fine. So, I did.

Tillimon did not return her security deposit, but she did not know why.

{¶ 42} Janice submitted as an exhibit a notarized letter that she wrote to Tillimon in response to his security deposit accounting letter. She wrote the letter of her own volition before retaining counsel and before the lawsuit was filed because she "was so shocked by the allegations" in Tillimon's letter to her and "was getting nervous that this would happen." Janice did not ask Tillimon to return her security deposit.

{¶ 43} In her letter, she claimed that all of the items Tillimon accused her, Jenna, Rodriguez, and Chazz of leaving at the house were there before she and Chazz moved in. Among the things she found when she moved in were containers of used motor oil, tools, a workbench, "a bunch of paint[,]" "a motorcycle frame[,]" a jacuzzi, and "tons of stuff" behind the garage. Tillimon did not remove any of these items from the house while she lived there, but Janice removed some of the things from behind the garage to prevent rats from nesting there and found someone to take the motorcycle frame. She claimed that Tillimon told her and Chazz that they "could have what we wanted and . . . do what we wanted with the rest of it. But [she] never told him [she] was going to clean it out."

{¶ 44} Janice also wrote, "When [Tillimon] showed us the home, it was filthy, in dire need of new carpet throughout, dire need of paint throughout, doors were off hinges, one door was broken in half, only 1 and sometimes 2 outlets worked in each of the rooms, there were windows broken in the basement and garage, the entire basement and garage were filled with junk, including tires, the microwave didn't work, the kitchen sink had no water pressure and leaked . . . ."

{¶ 45} Janice had complaints about the house in addition to the things in the letter. She was never able to park a car in the garage because "there was too much stuff in

16.

there." For some period of time, Janice was not able to access the garage at all. Tillimon eventually rectified that by installing a new garage door. Around 2018, a city inspector came to the house and told Janice that Tillimon had to fix some issues with the property, which resulted in Tillimon having gutters installed on the house. She identified water leaks behind the kitchen sink and in the basement underneath the bathroom that she was concerned about, but these did not cause any health issues. There were no window treatments other than one curtain in the kitchen and one on a side door when Janice moved into the house. She put up window treatments that she left when she moved out.

{¶ 46} While Janice lived there, Tillimon made some repairs to the house. For example, he fixed the furnace "a few times[,]" which would normally take three or four days from the time Janice told him it had stopped working. After a couple of cycles of this, Janice paid an acquaintance to repair the furnace for her. Other than that, Tillimon did not make any cosmetic or structural repairs to the property while she lived there. In addition to the window treatments and furnace repair, Janice paid for "a lot of fuses" while she lived in the house because it is a "very old house with an old electrical system."

{¶ 47} Janice believed that when she moved out the house was "[c]leaner. The same structurally, everything, but it was much cleaner than when [she] moved in." The soot Tillimon testified to did not make sense to her. She believed that the carpet only showed normal wear and tear from her time in the house. In fact, she claimed that "there was no damage that [she] did to the house, nothing[,]" and she had actually fixed some things, like a bathroom door that was broken when she moved in.

17.

{¶ 48} On cross, Janice said that she stayed in the house for eight years—despite its condition—because it had air conditioning, Tillimon never raised the rent, and it was in a good school district. She thought Tillimon's testimony about her taking over Chazz's lease was completely made up; she and Chazz moved in at the same time, and Chazz was never on a lease by himself.

{¶ 49} Janice said that she never received the letter Tillimon sent accounting for the security deposit, so she was not aware of Tillimon's offer to walk through the property with her, but clarified on redirect that her notarized letter was in response to the letter in which Tillimon suggested the walkthrough.

{¶ 50} After Janice testified, she and Jenna rested.

{¶ 51} At the end of the trial, the court took Janice's and Jenna's objections to the hearsay and lack of foundation "on numerous of the exhibits included in [Tillimon's] affidavit[s]" under advisement.

**D. Trial court's decision**

{¶ 52} In its decision, the trial court first found that its "journal entry dated Oct. 23, 2023" mooted Chazz's motion to quash Tillimon's subpoena and Tillimon's responses to Chazz's motion.[4] Despite holding that the motion to quash was moot, the

---

[4] Although the court held the trial on October 23, 2023, the record does not include a journal entry from that date. There is a journal entry dated August 23, 2023, and journalized November 27, 2023, that says "Trial held testimony taken. Exhibits admitted[.] See JE[.]" This entry also notes that Chazz's motion to quash is moot and Tillimon's filing in response to the motion to quash, which he filed after trial on October 23, is "moot as well." The only judgment entry in the record that might have been the "JE" noted on the journal is the court's final judgment entry from October 31.

18.

court found that Tillimon did not timely file the subpoena, Chazz's failure to appear at trial did not unduly prejudice Tillimon, and Tillimon did not ask for a continuance to secure Chazz's testimony.

{¶ 53} Next, the court granted Janice's and Jenna's motions to strike portions of Tillimon's damages affidavit. It found that he failed to authenticate many documents in the affidavit, and that many of the documents were estimates, not evidence of actual costs he sustained from Janice and Jenna's breach of their lease. Therefore, the court excluded exhibits 3 and 3-A through 3-M, which related to "Cleaning and Repairs Beyond Normal Wear to the House[,]" and exhibits 5 and 5-A, which were "photographs represent[ing] the condition the house was left in by the defendants when the house was vacated" and a receipt for the cost of film.

{¶ 54} The trial court also confirmed its decision to grant a directed verdict to Rodriguez because he "is not a person liable for damages under R.C. 5321.01(A) . . ." and Tillimon "failed to establish any connection between the damages to the property and [Rodriguez]." Additionally, as a result of the directed verdict and Rodriguez's failure to prosecute, the court dismissed Rodriguez's cross-complaint.

{¶ 55} Regarding the merits of the case, the trial court found that Tillimon failed to establish the condition of the house before Janice and Jenna took possession, so he was unable to prove the reasonable cost of restoring the property. The court rejected Tillimon's argument that the lease term requiring Janice and Jenna to give him written notice of preexisting damages somehow negated his duty to prove the house's preoccupancy condition. It also noted that Janice and Jenna told Tillimon about problems

19.

with the property as they arose, and Tillimon did not appropriately address the problems. Ultimately, the court concluded that "[e]ven in construing the condition of the property in a light favorable to [Tillimon], the court cannot find sufficient competent, credible evidence to establish the elements of [Tillimon's] claim, as most of [Tillimon's] claims are rebutted by [Janice's and Jenna's] testimony or unsupported by any admissible evidence."

{¶ 56} For the portions of Tillimon's damages that were supported by admissible evidence, the court found that they showed only normal wear and tear. Although the payments showed that Tillimon "paid some sum of money to clean the property, there is no sufficient evidence supporting the claim that the cleaning was the result of damages beyond normal wear and tear." Consequently, the trial court granted judgment in Janice's and Jenna's favor.

{¶ 57} Tillimon now appeals, raising four assignments of error:

Assignment of Error #1[:] The Trial Court committed reversable error, and abused its discretion, by failing to award the Plaintiff a judgment for reimbursement of the cost of repairing damages caused by the tenants and/or occupants of his rental property because the judgment was against the sufficiency of, the manifest weight of the evidence.

Assignment of Error #2[:] The Trial Court committed reversable error, and abused its discretion, by granting the Judgment Debtors Civ.R. 60(B) motions for relief from judgment without first holding a hearing on

20.

the issue, and therefore the judgment was against the manifest weight of the evidence.

Assignment of Error #3[:]  The Trial Court committed reversable error, and abused its discretion by dismissing a Party accused of damaging his rental property prior to trial, after the Plaintiff presented to the Court a prima facia case against the Party and therefore the judgment for dismissal was unsupported by sufficient evidence also against the manifest weight of the evidence.

Assignment of Error #4[:]  The Trial Court committed reversable error, and abused its discretion, by failing to sanction a subpoened [sic] Witness having definitive information who failed to appear for trial.

## II. Law and Analysis

### A. We do not have jurisdiction to address the Civ.R. 60(B) decisions.

{¶ 58} For ease of discussion, we address Tillimon's assignments of error out of order.  In his second assignment of error, he argues that the trial court should not have granted Janice's, Jenna's, and Rodriguez's Civ.R. 60(B) motions without holding a hearing because he disputed the facts underlying their motions.  We cannot address the merits of this assignment of error because Tillimon did not properly appeal those decisions.

{¶ 59} To appeal "an order that is final upon its entry . . . [,]" a party must file a notice of appeal within 30 days of that entry.  App.R. 4(A)(1).  Timely filing a notice of appeal is "the only jurisdictional requirement for a valid appeal . . . ." *Transamerica Ins.*

21.

*Co. v. Nolan,* 72 Ohio St.3d 320 (1995), syllabus, citing App.R. 3(A). An order setting aside a default judgment is a final, appealable order. *GTE Automatic Elec., Inc. v. Arc Industries, Inc.*, 47 Ohio St.2d 146, 150 (1976); *see also McKinzie v. Fry*, 2022-Ohio-2292, ¶ 16 (6th Dist.) (an order granting a Civ.R. 60(B) motion to set aside judgment is final and appealable only if the underlying judgment was final); *Gasper v. Bank of Am., N.A.*, 2019-Ohio-1150, ¶ 8 (9th Dist.) (a default judgment is a final order subject to a Civ.R. 60(B) motion to vacate when it resolves the issues of both liability and damages).

{¶ 60} The trial court issued its decision on Jenna's and Rodriguez's motions on February 1, 2023, and its decision on Janice's motion on June 29, 2023. Each Civ.R. 60(B) decision vacated a default judgment that determined liability and damages, so each was a final judgment. Tillimon did not file a notice of appeal within 30 days of either decision. Therefore, we do not have jurisdiction to consider the merits of his arguments related to the Civ.R. 60(B) decisions, and his second assignment of error is not well-taken on that basis.

### B. Tillimon did not produce any evidence of substantive probative value showing that Rodriguez was involved in damaging the property.

{¶ 61} In his third assignment of error, Tillimon argues that the trial court erred by granting Rodriguez a directed verdict at the close of his case. He contends that the complaint put Rodriguez on notice of the allegations against him, and that he presented sufficient evidence that Rodriguez caused damage to the property and should be liable for the damages. He also claims that the trial court prevented him from being able to cross-examine Rodriguez by dismissing Rodriguez from the case.

22.

{¶ 62} A decision to grant or deny a motion for a directed verdict under Civ.R. 50(A)(4) is a question of law that we review de novo. *Rieger v. Giant Eagle, Inc.*, 2019-Ohio-3745, ¶ 8. A motion for a directed verdict should be granted when, after construing the evidence most strongly in favor of the nonmoving party, the court finds that reasonable minds could come to but one conclusion and that conclusion is in favor of the moving party. Civ.R. 50(A)(4). The test in Civ.R. 50(A)(4) "requires the court to determine whether there is any evidence of substantive probative value that favors the nonmoving party." *Rieger* at ¶ 9, citing *White v. Leimbach*, 2011-Ohio-6238, ¶ 22.

{¶ 63} In his "AMENDED COMPLAINT FOR MONEY ONLY (HOUSING)[,]" which he filed in the Housing Division of the Toledo Municipal Court, Tillimon alleged that Rodriguez was one of the defendants, and "the Defendants were tenants at all times relevant." Specifically, Rodriguez was "a sub-tenant pursuant to an oral agreement with Defendants Janice Hollstein and Jenna Hollstein" and left the house sometime around August 1, 2022. Regarding damage to the house, Tillimon claimed that Rodriguez and the others "left the house both dirty and damaged beyond normal wear . . ." and that "the damages to the property were intentional and have caused [him] to suffer willful and malicious injuries." Despite Tillimon's claim both at trial and in his brief that he did not sue Rodriguez as a tenant, the only fair reading of his complaint is that he did, in fact, sue Rodriguez as a tenant.

{¶ 64} That being the case, we agree with the trial court's assessment that Rodriguez was not a "tenant," i.e., "a person entitled under a rental agreement to the use and occupancy of residential premises to the exclusion of others." R.C. 5321.01(A).

23.

Rodriguez did not have any type of rental agreement with Tillimon, so, by definition, could not be Tillimon's tenant. At best, he was Janice and Jenna's sublessee. Generally speaking, an original lessor cannot sue a sublessee like he can sue the original lessee, and vice versa. *See Hooper v. Seventh Urban, Inc.*, 70 Ohio App.2d 101, 109 (8th Dist. 1980) ("Ohio courts have uniformly held that there is no privity of contract between the original lessor and a subtenant, and that therefore the lessor may not sue the subtenant for breach of a covenant contained in the original lease."); *Denune v. Williamson*, 1981 WL 5752, *2 (6th Dist. Aug. 14, 1981) (decedent's estate could not maintain wrongful death suit against landlords because there was no privity of estate or contract between landlords and decedent, who was tenant's sublessee). Therefore, if Tillimon was attempting to pursue Rodriguez under a lease or the landlord-tenant statutes, reasonable minds could only conclude that he was not entitled to recover against Rodriguez because Rodriguez was not Tillimon's tenant and did not have the responsibilities or obligations of one of Tillimon's tenants.

{¶ 65} Our conclusion does not change if Tillimon was pursuing Rodriguez under some other theory of liability because there is no evidence of substantive probative value that Rodriguez caused any damage to the Woodmont Road property. Construing the evidence most strongly in Tillimon's favor shows that (1) Rodriguez lived at the house for some period of time between December 2021 and August 2022; (2) some of the items left at the property included tires, used motor oil, and car parts; (3) Tillimon believed that someone was repairing automobiles in the garage, basement, or both; and (4) Rodriguez's "job was working in a[n auto] body shop someplace. So [Tillimon] assume[d] he did all

24.

that damage to the garage and the basement or most of it in the basement and all that's in the garage." At best, this amounts to Tillimon's speculation that Rodriguez was involved in damaging the property. It is not substantive, probative evidence of Rodriguez's involvement that would survive a motion for a directed verdict.

{¶ 66} Tillimon argues in his brief that Rodriguez should have been required to defend at trial because the complaint was sufficient to meet the notice pleading requirements of Civ.R. 8(A). This may be true, but by the time the case went to trial, Tillimon was required to do more than put Rodriguez on notice of the allegations against him. "In civil cases, the plaintiff bears the burden of proof to establish all the elements necessary to sustain a claim. . . . When the burden of proof is on a party for a given issue, that party will lose on that issue as a matter of law if he or she fails to come forward with evidence which tends to prove that issue." *Covey v. Bellman*, 2000 WL 1434127, *1 (6th Dist. Sept. 29, 2000), citing *Felger v. I-Deal Auto Sales*, 1997 WL 691450 (3d Dist. Oct. 31, 1997); and *State v. Robinson*, 47 Ohio St.2d 103, 107 (1976). Tillimon was required to prove by a preponderance of the evidence that Rodriguez *actually caused* damage to his property. He failed to do so. Thus, Rodriguez was entitled to a directed verdict.

{¶ 67} Tillimon also complains that Rodriguez should have been required to testify at trial and that he lost the opportunity to cross-examine Rodriguez when the trial court dismissed him from the case. But nothing prevented Tillimon from calling Rodriguez as a witness during his case-in-chief and cross-examining him. It was Tillimon's choice to rest after presenting the court with his affidavits and without calling any witnesses. As the plaintiff, it was incumbent upon Tillimon to have Rodriguez testify

if he thought Rodriguez's testimony was necessary because the *plaintiff* is required to "produce sufficient evidence to support the case . . . ." *Welsh-Huggins v. Jefferson Co. Prosecutor's Office*, 2020-Ohio-5371, ¶ 21. In short, any prejudice Tillimon claims from not questioning Rodriguez is of his own making.

{¶ 68} Because Tillimon failed to produce any evidence of substantive probative value showing that Rodriguez caused damage to his property, reasonable minds can only conclude that Rodriguez is not liable to Tillimon. Tillimon's third assignment of error is not well-taken.

### C. The trial court's disposition of Tillimon's motion for sanctions was not an abuse of discretion.

{¶ 69} In his fourth assignment of error, Tillimon argues that the trial court abused its discretion by not sanctioning Chazz after he failed to appear at trial in response to Tillimon's subpoena. He points out that Chazz was obviously served with the subpoena because he filed a motion to quash, did not have the subpoena quashed before trial, chose not to appear at trial anyway, and was clearly in contempt of court. He asks that we order the trial court to "[s]anction Chazz Hollsteinn [sic] in $11,961.87, the amount of money Tillimon apparrently [sic] would have been awarded had Chazz Hollstein testified, or at least in the amount of money the Trial Court usually sanctions witnesses that fail to appear in response to a subpoena with evidence that the sanction is typical by citing at least three cases with similar situations."

{¶ 70} In response, Chazz argues that the trial court's decision not to sanction him was not unreasonable, arbitrary, or unconscionable because the court ruled "in-person . . .

26.

immediately preceding the trial[,]" and confirmed in its final judgment entry, that his motion to quash and Tillimon's subsequent filings were moot, and ultimately determined that the subpoena was untimely and Chazz's nonappearance was not unduly prejudicial to Tillimon.

{¶ 71} A witness can be compelled to testify at trial by a properly issued subpoena. Civ.R. 45(A)(1)(b)(i). "Failure by any person without adequate excuse to obey a subpoena served upon that person *may* be deemed a contempt of the court from which the subpoena issued." (Emphasis added.) Civ.R. 45(E); *see also* R.C. 2705.02(C) (failure to obey a "duly served" subpoena "may be punished as for a contempt"). "[I]t is entirely discretionary as to whether a sanction [under Civ.R. 45(E)] should be imposed." *Day v. Day*, 2009-Ohio-638, ¶ 29 (10th Dist.). Thus, we review a trial court's decision on Civ.R. 45 sanctions for an abuse of discretion. *Whitman v. Whitman*, 2023-Ohio-2732, ¶ 31 (5th Dist.). Abuse of discretion means that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610 (1996).

{¶ 72} Here, the trial court considered the merits of Tillimon's motion for sanctions despite deeming the motion "moot." It found Tillimon's subpoena untimely, noted that Tillimon did not ask for a continuance of the trial because Chazz was absent, and determined that Chazz's missing testimony did not unduly prejudice Tillimon. This was not an abuse of discretion.

{¶ 73} Based on the trial court's local rules, ten days is a reasonable amount of time for service of a subpoena. Toledo Mun.Loc.R. 28(B) ("The clerk of court . . . shall

27.

process subpoenas from a praecipe, *filed at least ten (10) days in advance of the trial date*." (Emphasis added.)). Tillimon—for whatever reason—did not try to subpoena Chazz until seven days before trial, which resulted in the delayed service that ultimately led to Chazz not appearing at trial. Then, when Chazz was not present, Tillimon did not bring his absence to the court's attention when something could have been done to mitigate its effects. He did not give the court any indication of how necessary he believed Chazz's testimony was to his case until he filed his response to the motion to quash after the trial was over. He did not bring up the issue of Chazz's absence until halfway through the trial, and that was only to say in response to a hearsay objection that he "subpoenaed Chazz to be here and he didn't show up." And he did not ask the court to continue the case until it ruled on the motion to quash or Tillimon could otherwise secure Chazz's testimony. *See Green v. Ohio Dept. of Rehab. & Corr.*, 1990 WL 2554, *3 (10th Dist. Jan. 16, 1990) (Appellant was not denied a fair trial when he received notice the morning of the hearing that witnesses' motions to quash were granted but did not ask for continuance because, although "the timing of the notification was less than ideal, appellant was aware of the situation and elected to proceed with the trial."); *Frees v. ITT Technical School*, 2010-Ohio-5281, ¶ 42 (2d Dist.) (although appellant did not file a transcript, the court noted that appellant "would have had the option of requesting a continuance if the witness truly were critical to his case" and found that there was "nothing in the record to indicate that [appellant] requested a continuance upon learning that the witness had not been served" with the subpoena).

28.

**{¶ 74}** Taking this into consideration, it was not unreasonable, arbitrary, or unconscionable for the trial court to determine that sanctions against Chazz were unwarranted. Accordingly, Tillimon's fourth assignment of error is not well-taken.

### D. The trial court's judgment is supported by the weight of the evidence.

**{¶ 75}** Finally, in his first assignment of error, Tillimon argues that the trial court's failure to award him the cost of repairing the damage to his property is against the manifest weight of the evidence. He points out that (1) he presented evidence of sustaining $11,961.87 in damages that were not attributable to lost rents, damage from the neighbor's tree, or damage that existed when Janice and Jenna moved in; (2) Janice's trial testimony conflicted with her earlier filings in the case; (3) Jenna gave detailed testimony at trial despite claiming incompetency in her Civ.R. 60(B) motion, and her testimony conflicted with her answer to the complaint; (4) Janice and Jenna did not disprove the amount of damages he sustained; (5) Janice and Jenna failed to prove that the damages to the house existed when they moved in; and (6) neither Janice nor Jenna explained why they would move into, pay rent for, and live in a house in such poor condition.

**{¶ 76}** We review a judgment following a bench trial under a manifest weight of the evidence standard. *Terry v. Kellstone, Inc.*, 2013-Ohio-4419, ¶ 12 (6th Dist.). In reviewing the judgment, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trial court clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the trial court's judgment must be reversed. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 29.

20.  As part of this review, we presume that the trial court's findings of fact are correct because the trial court "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80 (1984).  We generally defer to the trial court on issues of credibility.  *Suburban Realty L.P. v. MD Vape & Tobacco, LLC*¸ 2023-Ohio-3198, ¶ 38 (12th Dist.).  "Mere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment."  *Sotnyk v. Guillenno*, 2014-Ohio-3514, ¶ 4 (6th Dist.), citing *Seasons Coal* at 81.  We will not reverse a judgment supported by some competent, credible evidence going to all the essential elements of the case as being against the manifest weight of the evidence.  *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

{¶ 77} Tenants have a statutory duty to refrain from damaging rental premises, and a common law duty "'to return the leased premises in substantially as good a condition as when received, reasonable wear and tear excepted.'"  *Tillimon v. Myles*, 2018-Ohio-434, ¶ 30 (6th Dist.), quoting *Bibler v. Nash*, 2005-Ohio-5036, ¶ 18 (3d Dist.); R.C. 5321.05(A)(6) ("A tenant who is a party to a rental agreement shall . . . [p]ersonally refrain and forbid any other person who is on the premises with his permission from intentionally or negligently destroying, defacing, damaging, or removing any fixture, appliance, or other part of the premises[.]").  But tenants are generally not liable for damages that can be attributed to ordinary wear and tear.  *Levine v. Kellogg*, 2020-Ohio-1246, ¶ 40 (10th Dist.), citing *Kelley v. Johnston*, 2001 WL 1479243 (4th

30.

Dist. Nov. 14, 2001). For the tenant to be liable for extraordinary damages beyond normal wear and tear, "the landlord must establish the link between the damage and the tenants." *Myles* at ¶ 30. The landlord bears the burden of submitting evidence sufficient to link the tenants to the damage. *Levine* at ¶ 40. For the trial court to determine the reasonable cost to restore the property, it must have evidence of the property's condition before it was damaged. *Myles* at ¶ 30, citing *PAG Holdings v. Love*, 2012-Ohio-3388, ¶ 11 (2d Dist.).

{¶ 78} We have two preliminary issues to address before reaching the merits of this assignment of error. First, we note that Tillimon is not appealing the trial court's decision to exclude many of his trial exhibits. Because he did not assign the trial court's evidentiary ruling as error, we will not revisit that ruling and will not consider those exhibits. Without them, Tillimon had documentary evidence to support only his claims of damages beyond normal wear and tear to the yard and garage and evidence of soot in some light fixtures. His documentary evidence to support his claims of damages beyond normal wear and tear to the house and his photographs of the damage are not before us for consideration.

{¶ 79} Second, Tillimon points to multiple "facts" to support his manifest-weight argument that are flat-out wrong. For example, although Tillimon claims Janice never explained why she would continue living in a house in such bad condition, Janice testified that she continued living in the house despite its condition because it had air conditioning, Tillimon never raised the rent, and it was in a good school district. Next, although Tillimon makes much of Janice "testif[ying] that that [sic] the damages existed

31.

at the time she took over occupancy from her son Chazz Hollstein which is in conflict with her prior testimony and her trial exhibits[,]" she never once said that she "took over occupancy from" Chazz.  She consistently claimed that she and Chazz signed the 2015 lease together as cotenants and moved in at the same time, and that the damages existed when she moved into the house.  Further, Jenna did not claim in her Civ.R. 60(B) motion that she was "mentally incompetent to understand what was even going on, . . ." or "blame[] the neighbor's fallen tree for causing most of the damages" to the house in her answer.  She said in her affidavit in support of her motion to vacate that she was young, lacked familiarity with the judicial process, and was confused by conflicting notices from the trial court, which is not remotely equivalent to claiming incompetence.  And nothing in her answer can be construed as referring to the neighbor's tree falling on the house.  However, she did say in her affidavit that "the property . . . was made uninhabitable by a tree falling on the premises.  This act of God is the basis for *some of* [Tillimon's] alleged damages."  (Emphasis added.)  Finally, Tillimon incorrectly claims that the trial court never dismissed Rodriguez's cross-claim, which it quite clearly did in its final judgment entry.

{¶ 80} Regardless of Tillimon's misrepresentations, the record shows that the trial court's decision is not against the manifest weight of the evidence.  In its judgment entry, the trial court found that Tillimon did not meet his burden of establishing the condition of the Woodmont Road property before Janice and Jenna moved in, and the term in the lease requiring them to notify him of preexisting damage did not negate that burden.  The court also found that Janice and Jenna told Tillimon about "debilitating conditions of the

32.

property as they occurred or were discovered . . ." that Tillimon did not remedy.  Based on that, and "construing the condition of the property in a light favorable to [Tillimon], . . ." the court did not find competent, credible evidence to support Tillimon's claims because most of them were rebutted by Janice's and Jenna's testimony or unsupported by admissible evidence.  The court also found that the admissible receipts Tillimon submitted showed that he paid some amount of money to clean the property, but were not competent, credible evidence supporting his claim that the cleaning resulted from damages beyond normal wear and tear.

{¶ 81} As the parties acknowledged at trial, this case primarily came down to credibility, and the trial court clearly found Tillimon's testimony less credible than Janice's and Jenna's.  Although Tillimon testified that Chazz moved into the Woodmont Road house first and the house was in good condition when he went there so Janice could sign to assume Chazz's lease, Janice and Jenna testified to Janice and Chazz signing the same lease, all three moving into the house at the same time, and garbage left around the property, worn and dirty carpets, dirty walls, a broken microwave, old appliances, missing window treatments, broken doors, water leaks, and electrical issues when they moved in.  The trial court chose to believe Janice and Jenna, and we generally defer to the trial court's credibility findings in a manifest weight review.  *Suburban Realty*, 2023-Ohio-3198, at ¶ 38 (12th Dist.).

{¶ 82} Beyond that, the record contains some competent, credible evidence supporting the trial court's determination that Janice (who provided the bulk of the defense testimony) was more credible than Tillimon.  The 2015 lease that Tillimon

33.

attached to his complaint seems to support Janice's claim that she and Chazz signed a lease together and moved into the Woodmont Road house at the same time—i.e., that Chazz did not live at the house by himself first. Contrary to Tillimon's testimony, this lease, which Chazz and Janice each signed as tenants, gives no indication that Janice was assuming the lease, Chazz was signing as some type of guarantor because Janice had a prior eviction, Chazz's prior lease was somehow extended because Janice was signing it, or Chazz was not going to be living at the house despite being listed as a tenant on the lease. Additionally, Tillimon mentioned several times that Janice moved into the house in 2017, which does not match the 2015 dates in the first lease that she signed with Chazz. In short, nothing in the trial court's ultimate credibility determination convinces us that the trial court clearly lost its way in resolving the conflicting testimony and created such a manifest miscarriage of justice that its judgment must be reversed. *Eastley*, 2012-Ohio-2179, at ¶ 20.

{¶ 83} Regarding the cleaning costs, the record also contains some competent, credible evidence supporting the trial court's finding that Tillimon's evidence does not show that he incurred costs for damages beyond normal wear and tear. The payments were for things like mowing, weeding, and washing the garage floor, which a landlord could reasonably expect to do when any tenant moves out. Although Janice and Jenna's lease made them responsible for lawn maintenance, Tillimon did not contract for lawn services until a month after they moved out and did not show that these services were beyond ordinary lawn-maintenance needs.

34.

{¶ 84} Tillimon's final argument under this assignment of error is that Janice and Jenna failed to prove that the damages did not exist when they moved in and failed to disprove the amount of damages he sustained. Once again, Tillimon misapprehends his burdens in this litigation. As the plaintiff, it was his burden to show the condition of the property before Janice and Jenna moved in and after they moved out. *Myles*, 2018-Ohio-434, at ¶ 30 (6th Dist.). It was also his burden to prove the amount of damages he sustained because of things Janice, Jenna, or both of them did. *See id.* If he failed to meet his burdens, neither Janice nor Jenna was required to do anything to have the court enter a verdict in her favor. *Covey*, 2000 WL 1434127, at *1 (6th Dist.) ("When the burden of proof is on a party for a given issue, that party will lose on that issue as a matter of law if he or she fails to come forward with evidence which tends to prove that issue."). The trial court found that Tillimon failed to show the property's condition before Janice and Jenna moved in and failed to show that his cleaning costs were for damages beyond normal wear and tear—his burdens as the plaintiff—so he was not entitled to judgments against Janice and Jenna as a matter of law. Consequently, they did not have to rebut or disprove any of his evidence to get a verdict in their favor.

{¶ 85} Because the trial court's findings that Tillimon failed to meet his burden of proving the property's condition before Janice and Jenna moved in and failed to show that any cleaning costs he incurred were due to damage beyond ordinary wear are not against the manifest weight of the evidence, Tillimon's first assignment of error is not well-taken.

35.

### III. Conclusion

**{¶ 86}** Based on the foregoing, the October 31, 2023 judgment of the Toledo Municipal Court, Housing Division, is affirmed. Tillimon is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.           

_____
JUDGE

Christine E. Mayle, J.        

_____
JUDGE

Charles E. Sulek, J.         
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.